**UNITED STATES of America,
Plaintiff,**

v.

**CITIZEN PUBLISHING COMPANY, Star Publishing Company, Tucson Newspapers Incorporated, Arden Publishing Company, and William A. Small, Jr., Defendants.**

**No. Civ–1969.**

United States District Court
D. Arizona.

Jan. 31, 1968.

Charles D. Mahaffie, Jr., Gerald A. Connell, Dept. of Justice, Washington, D. C., Jo Ann D. Diamos, Asst. U. S. Atty., Tucson, Ariz., for plaintiff.

Richard J. MacLaury, Charles B. Renfrew, Harvey D. Hinman, Gary A. Martin, Pillsbury, Madison & Sutro, San Francisco, Cal., George Read Carlock, Ryley, Carlock & Ralston, Phoenix, Ariz., John L. Donahue, Jr., Merchant, Lohse, Donahue & Bloom, Tucson, Ariz., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES A. WALSH, Chief Judge.

This action having been tried by the court, sitting without a jury, the court does hereby find the facts and states separately its conclusions of law thereon, as follows:

### FINDINGS OF FACT
### JURISDICTION

1. This is an action brought by the United States under Section 4 of the Sherman Act and Section 15 of the Clayton Act (15 U.S.C. §§ 4, 25).

2. The defendant corporations maintain offices, transact business and are found within the District of Arizona.

3. Defendant Citizen Publishing Company (hereinafter "Citizen Publishing") is a corporation organized and existing under the laws of the State of Arizona and has its principal place of business in Tucson, Arizona. It is engaged in the business of publishing in Tucson a daily, except Sunday, newspaper of general circulation known as "The Tucson Daily Citizen" (hereinafter "Citizen").

4. Defendant Star Publishing Company (hereinafter "Star Publishing") was, at the time this action was brought, a corporation organized and existing under the laws of the State of Arizona with its principal place of business in Tucson, Arizona. At the time this action was brought it was engaged in the business of publishing in Tucson a daily newspaper of general circulation known as "The Arizona Daily Star" (hereinafter "Star").

5. Defendant Tucson Newspapers, Incorporated (hereinafter "TNI") is a corporation organized and existing under the laws of the State of Arizona and has its principal place of business in Tucson, Arizona. At the time this action was brought it was wholly owned by Star Publishing and Citizen Publishing and was engaged in the business of acting as agent for them in the management and operation of the advertising, printing, and circulation departments of their newspapers.

6. Defendant Arden Publishing Company (hereinafter "Arden") is a corporation organized and existing under the laws of the State of Arizona and has its principal place of business in Tucson, Arizona. It was incorporated on or about December 21, 1964, by the stockholders of Citizen Publishing to acquire and hold the stock of defendant Star Publishing and on January 5, 1965, did acquire that stock at a purchase price of $9,999,790.

7. On March 31, 1966, pursuant to an order of the court granting defendant's motion, Star Publishing was liquidated and Arden acquired its assets. Arden now publishes Star.

8. Defendant William A. Small, Jr., is the sole stockholder of defendant Arden and was joined as a defendant in this action on March 31, 1966, pursuant to an order of the court granting defendants' motion.

9. Defendants Citizen Publishing, TNI and Arden are engaged in commerce within the meaning of Section 7 of the

Clayton Act. Defendant Star Publishing was so engaged at the time this action was brought.

### THE ACTS AND INTENT OF THE DEFENDANTS

10. The Star is, and during the period covered by the complaint has been, the only Sunday and morning daily newspaper of general circulation published in Tucson.

11. The Citizen is, and during the period covered by the complaint has been, the only evening daily newspaper of general circulation published in Tucson.

12. From 1932 to 1940, Citizen Publishing operated at a substantial loss. Its losses were defrayed by contributions made by its stockholders. Star Publishing from 1932 to 1940 operated at a profit.

13. In the period 1935 to 1939, though the respective circulations of the papers were approximately equal, Star sold fifty percent more advertising space than Citizen.

14. In 1936, William A. Small, Sr., and William H. Johnson contracted to purchase the stock of Citizen Publishing from the Hitchcock Estate, at that time putting $25,000 of working capital into the paper and agreeing to pay the $100,000 purchase price over a period of time. At the time of the purchase, William A. Small, Sr., was familiar with the financial condition of Citizen Publishing. When Small, Sr., became interested in Citizen, he acquired a 25% interest in the paper and Johnson obtained a 75% interest. Between 1936 and 1939, the respective interests of the purchasers changed, and Johnson owned 25% while Small, Sr., and his wife owned 75% of the paper. Following the purchase of Citizen Publishing by Small, Sr., and Johnson and from 1937 to 1940, Citizen Publishing lost money. Between 1937 and 1939, Small, Sr., made unsuccessful efforts to attract additional financing to Citizen Publishing, and in 1939 he moved to Tucson, being prepared to finance the losses of Citizen Publishing for some little time thereafter from resources available to him other than the earnings or assets of Citizen Publishing.

15. For many years prior to 1940, Citizen Publishing had been unable to pay a dividend. Prior to 1940, Mr. Small, Sr., received no salary and by March, 1940, Citizen Publishing owed debts of more than $109,000. Of this indebtedness, about $79,000 was to stockholders of Citizen Publishing.

16. Starting at some time in 1936, there were discussions between Star Publishing and Citizen Publishing, which were initiated by Star Publishing, concerning the possibility of a joint operation of the two newspapers.

17. As a result of these discussions, Citizen Publishing and Star Publishing on March 28, 1940, entered into a joint operating agreement, to become effective on July 1, 1940. At the time Star Publishing and Citizen Publishing entered into the operating agreement, and at the time the agreement became effective, Citizen Publishing was not then on the verge of going out of business, nor was there a serious probability at that time that Citizen Publishing would terminate its business and liquidate its assets unless Star Publishing and Citizen Publishing entered into the operating agreement.

18. The agreement provided that each newspaper would retain its separate identity and that the news and editorial departments of each would remain separate. It also provided for formation of an agency corporation, defendant TNI, whose function would be "to manage and operate all of the departments of the publishing business of Star and Citizen (excluding the news and editorial departments as hereinabove provided), and to integrate the operation of said business as much as possible."

19. The agreement provided that the profits realized from the publication of the newspapers would be pooled and distributed by TNI to Star Publishing and Citizen Publishing according to a specified ratio; and that during its term, Star Publishing and Citizen Publishing, as well as their stockholders, officers and

executives, would not engage in any other publishing business in Pima County or engage in any other business in conflict with the agreement. Pursuant to the operating agreement, since 1940, Star and Citizen have been sold and distributed to the public by the circulation department of TNI, commercial advertising placed in Star and Citizen has been sold by the advertising department of TNI, and the circulation and advertising rates of Star and Citizen have been set by Star Publishing and Citizen Publishing jointly, acting through TNI.

20. The operating agreement provided that it could be cancelled by mutual consent of both parties; its original term was 25 years but in 1953 this was extended to 1990.

21. Prior to the execution of the 1940 operating agreement, the owners of Star and Citizen believed there could not be a successful operation of two competing dailies in a city with a population of 100,000 or under. They were also aware of the success of the operating agreements then in effect between the newspapers in El Paso, Texas, and Albuquerque, New Mexico.

22. The 1940 operating agreement states that the parties thereto believed that the past 15 years of experience had shown that the Tucson area was not large enough to support, at a profit, two completely independent newspapers.

23. It was the intent of the parties to the operating agreement to reduce costs and increase profits by eliminating commercial competition between Star and Citizen (which were in 1940 the only daily newspapers of general circulation in Tucson), while retaining separate competitive news and editorial departments.

24. It was in furtherance of their intent to eliminate competition between Star and Citizen that the parties inserted a profit pooling provision in the operating agreement.

25. From July 1, 1940, through January 4, 1965, Star and Citizen were operated pursuant to the operating agreement.

26. At all times between July 1, 1940, and January 5, 1965, Star Publishing and Citizen Publishing remained independently owned corporations and retained the sole ownership of their respective newspapers.

27. Pursuant to paragraph 5 of the operating agreement, Star Publishing transferred to TNI as working capital all of its accounts receivable, and Citizen Publishing transferred to TNI as working capital all of its accounts receivable. Pursuant to paragraph 4 of said agreement, title to all of the machinery and equipment, typesetters, automobiles, furniture and fixtures owned by Citizen Publishing (except the amount retained for use by the news and editorial department of Citizen) and used to produce its newspaper, was vested jointly in Citizen Publishing and Star Publishing. Pursuant to said provision of the operating agreement, title to all of the machinery and equipment owned by Star Publishing (except the amount retained for use by the news and editorial departments of Star), and used to produce its newspaper was vested jointly in Citizen Publishing and Star Publishing. As a result of this transaction, 87% of the machinery, equipment and other property used by Star in producing its newspaper was transferred to the joint ownership of Star Publishing and Citizen Publishing, and 92% of the machinery, equipment and other property used by Citizen to produce its newspaper was transferred to the joint ownership of Star Publishing and Citizen Publishing.

28. The possession and management of the jointly owned assets of Star Publishing and Citizen Publishing formerly used in the production of their newspapers was transferred to TNI on or about July 1, 1940.

29. Pursuant to the operating agreement, stock of TNI was owned in equal shares by Citizen Publishing and Star Publishing, except for two qualifying shares issued to one director; and the board of five directors of TNI was com-

posed of two members appointed by Citizen Publishing, two by Star Publishing, and a fifth director selected by Citizen Publishing from three persons nominated by Star Publishing.

30. Pursuant to the operating agreement, TNI received the advertising, circulation and other revenues earned by the operation of TNI which, after deduction of operating expenses of TNI, were distributed by TNI to Star Publishing and Citizen Publishing in accordance with a formula which was intended to provide each company with sufficient funds to publish a quality newspaper without financial loss.

31. Pursuant to the 1940 operating agreement, Star Publishing and Citizen Publishing retained separate news and editorial staffs and engaged in intense rivalry with each other in the composition of news and editorial material which was printed and circulated by TNI. Pursuant to said agreement, the expenses incident to preparing news and editorial material published in Star and Citizen were paid separately by Star Publishing and Citizen Publishing out of receipts from TNI. Star Publishing received an extra allowance from TNI to defray expenses incident to the preparation of the Sunday issue of Star.

32. Consistent with the operating agreement, TNI since July, 1940, has operated a business department which is responsible for plant maintenance, purchase of supplies, TNI payroll and personnel records, revenue and expense records, credit records, advertising lineage records, labor negotiations and other details common to most businesses.

33. Pursuant to the operating agreement, TNI, since July, 1940, has operated the mechanical facilities jointly owned by Star Publishing and Citizen Publishing necessary to produce the newspapers. Toward this end TNI operated a single composing room, a single stereotype department, and combined printing press facilities. TNI also operated a single dummy desk and proof room.

34. The joint operations by TNI of the circulation, advertising, and production departments has resulted in substantial cost savings and in a slight decrease in production expenses.

35. Although during the five years prior to joint operation the before-tax combined profits of Star and Citizen never exceeded 2.2 percent of revenues, in the first full year of joint operation this rose to 10.4 percent.

36. Since the commencement of joint operations the combined before-tax profits of Star and Citizen have never been less than 10.2 percent of revenues. Since 1959 combined before-tax profits have been constant at about 20 percent of revenues.

37. During the period 1940 through 1964, the combined revenues of Star and Citizen have increased each year, excepting only in 1942. During that time revenues rose from $519,168 to $8,654,127 and before-tax profits went from $27,531 to $1,727,217.

38. Prior to the time the operating agreement was executed the parties planned to increase their advertising rates after the first year of joint operation; and this increase in fact was made.

39. The defendants Star Publishing and Citizen Publishing were aware, at the time the operating agreement was executed that advertisers interested in reaching potential customers residing in Pima County had no means of advertising equivalent to Star and Citizen.

40. It was the purpose of the operating agreement to attain for Star Publishing and Citizen Publishing, acting jointly, power over prices in the daily newspaper business in Tucson.

41. The principal classes of advertising sold by TNI are local display, national display, classified and legal. A combination local display rate is offered by TNI to advertisers who want to place the same advertisement in Star and Citizen. Ninety percent of all local display advertising space is sold at combination rates. The combination rate for local display advertising offered by TNI was in 1940, and still is today, approximately 19 percent less than the

sum of the rates charged for placing separate advertisements in the Star and Citizen.

42. The most profitable advertising sold by TNI is national advertising.

43. National advertisers and advertising agencies who buy newspaper display advertising for a national advertiser evaluate its cost by determining the cost of distributing one agate line of advertising space to a million readers, or to a hypothetical million readers. Generally, newspaper advertisers and advertising agencies are motivated in placing their newspaper advertising by circulation as well as by the per line or per inch rate.

44. Tucson advertising agencies and advertisers, including those who advertise in areas other than Tucson, who testified in this case believe that the TNI rates are reasonable. Those who advertise in both Star and Citizen are satisfied with the combination rate and prefer to deal with TNI as a single entity rather than with two separate advertising departments representing the respective newspapers, because the present arrangement reduces costs to the advertiser by reason of time and expense involved in preparing and placing advertising material. However, the witnesses could not know or judge whether they would be better satisfied or would have lower overall advertising costs if Star and Citizen were in commercial competition.

45. Advertising rate increases by TNI since 1940 have been accompanied by an increase in circulation.

46. The operating agreement has been successful. Since the inception of this agreement in 1940, the financial condition of Citizen Publishing has steadily improved. In 1964, Citizen Publishing and Star Publishing were in sound financial condition and have provided the Tucson area with two newspapers of high quality.

47. At the time that Star Publishing and Citizen Publishing executed the operating agreement the stockholders of Star Publishing and Citizen Publishing entered into a Stock Agreement which provided that should the owners of stock of either corporation desire to sell, the owners of the stock of the other corporation would have an option to purchase.

48. It was the expressed intention of the parties to the Stock Agreement that it should be read in connection with the operating agreement and considered as a part thereof.

49. A purpose of the Stock Agreement was to ensure that defendants could control entry into the daily newspaper business in Tucson.

50. In 1964, the owners of Star Publishing decided to sell their newspaper and received an offer to buy from Brush-Moore Newspapers, Inc., the offered price being approximately $10,000,000.

51. In order to prevent Brush-Moore from buying Star the stockholders of Citizen Publishing, acting pursuant to the Stock Agreement, organized Arden and on December 21, 1964, exercised their option to purchase Star.

52. On January 5, 1965, a motion of plaintiff to enjoin the acquisition of the Star Publishing stock by the Smalls was denied and on the same date the acquisition was consummated through Arden on the same terms and conditions as set forth in the purchase agreement between Brush-Moore and the stockholders of Star Publishing.

53. Paragraph 10 of the purchase contract between Brush-Moore and the stockholders of Star Publishing provided that Brush-Moore was purchasing the shares for the purpose of investment and that it would not for a five-year period transfer the shares to the public or a third party, and further that none of the shares would be sold or distributed to the public or to anyone in any manner, unless the shares were registered under applicable securities acts, or unless an opinion of counsel that such registration was not necessary had been obtained.

54. Paragraph 10 of the Brush-Moore stock purchase contract further provided that the restriction on the transfer of the Star Publishing stock was to assure the principal stockholders of Star Publishing

that the transfer of the shares under the Brush-Moore purchase contract was "an exempt transfer under section 4(1) of the Federal Securities Act of 1933, as amended".

55. When their option to purchase the Star Publishing stock was exercised and when the acquisition of Star Publishing stock by Arden was consummated, the Smalls had been advised by counsel and they believed that the terms of the Brush-Moore stock purchase contract might not prevent them from disposing of their interests in Star Publishing and Arden before the expiration of five years but they realized they might be required to retain such interests for the period specified in the contract. The Smalls had in mind that if the purchase contract did not prevent them from selling their interests in Star Publishing and Arden before expiration of five years, they might dispose of such interests provided: (a) the purchaser was a publisher whom they deemed suitable and who was not then doing business in the Tucson area, and (b) the transaction could be accomplished without financial loss to the stockholders of Citizen Publishing.

56. As a result of the acquisition of Star by Arden, the news department of Star, previously independent, is now controlled by the owners of Citizen.

57. The acquisition has the effect of virtually eliminating the likelihood of renewal of commercial competition between Star and Citizen upon either expiration or cancellation of the operating agreement.

58. The acquisition has the effect of continuing, in a more permanent form, the elimination of commercial competition which resulted from the operating agreement.

59. The acquisition may substantially lessen competition or tend to create a monopoly in the daily newspaper business in Tucson.

## THE "MARKET" ISSUES

### A. *The Product Market*

60. The business of publishing a daily newspaper of general circulation includes three operations: the gathering and dissemination of news and information, the sale of space in the newspaper to advertisers, and the sale of the newspaper to its readers. These three operations are interdependent and inseparable; success of any one of them depends upon the success of the other two.

61. The business and commercial functions of a newspaper are performed by the advertising, circulation, production and business departments. The advertising department sells advertising space to local merchants and national advertisers. It prepares advertising copy which is dispatched to the production department; there the copy is set in type by the composing room; in the stereotype room the type is transformed into curved metal plates which are fitted to a rotary press which prints the newspaper at great speed. The printed paper is delivered by conveyor to the circulation department, which prepares the papers for distribution by trucks, newsboys, dealers, and mail. The circulation department is responsible for selling and distributing the newspaper.

62. The business department of the newspaper receives the revenues derived from the sale of advertising space and the sale of the newspaper. It also administers the details common to most businesses such as labor relations, credit, accounting functions, employee health and welfare programs, plant maintenance, and payroll and personnel records.

63. The function of the news and editorial department is to write editorials and gather and prepare news stories and features of interest to the public. This material is composed in type form and printed in much the same manner as advertising copy.

64. A high-quality metropolitan newspaper is one which reports full and

accurate coverage of international, national, state, and local news and publishes responsible editorials and other material of service to its readers. Star and Citizen are both high-quality metropolitan daily newspapers of general circulation and do contain, among other things, complete and accurate coverage of local, state, national, and international news; editorials; society news; stock market tables; schedules of radio and television programs; home management news; church and religious news; comics; features; sports; local display; national display; classified and legal advertising. Star and Citizen each has extensive wire service facilities.

65. The quality of a newspaper is directly related to its cost and revenues. A properly financed newspaper can afford to employ a qualified staff of reporters, editors and assistant editors. There is keen competition among newspapers for such personnel. The quality of a newspaper may be improved by the extent to which it can afford to buy syndicated features and subscribe to news wire services.

66. Newspapers derive their revenue from the sale of advertising space and the sale of the newspaper itself, but the success of this, the commercial end of the business, depends on the success of the news and editorial operations; and successful news and editorial operations depend greatly upon the revenue derived from advertising and circulation.

67. The primary source of newspaper revenue is the sale of advertising space. Generally, circulation revenues amount only to between 22 and 28 percent of the total revenues of the newspaper and are not sufficient by themselves to support a successful newspaper operation.

68. The quality, circulation, and advertising revenues of a newspaper are interrelated. Generally, as the quality of a newspaper improves it receives wider public acceptance and its circulation increases. As the circulation increases, the newspaper becomes more attractive to merchants as an advertising medium and advertising revenues consequently in-

crease. The increased revenues, in turn, enable the publisher to increase his expenditures on the news and editorial staff, wire services, and syndicated features and otherwise improve the quality of the newspaper. As a corollary to this process, it is to be expected that if the quality of the newspaper falls, there will be a loss of circulation to other publications, which will adversely affect newspaper advertising revenues, and a decline in advertising revenues will further adversely affect the quality of the newspaper, resulting in a further decline in circulation.

69. The only daily printed media other than Star and Citizen published in Tucson are the Daily Reporter, a legal newspaper, and the Arizona Wildcat, the campus newspaper of the University of Arizona. Neither of these is comparable to the Star and Citizen.

70. The other daily newspapers of general circulation which are circulated in Tucson do not carry Tucson news and information of only local interest and, accordingly, are not substitutes for Star and Citizen.

71. There are no newspapers comparable to Star and Citizen issued and published in Tucson.

72. The production facilities of the Star and Citizen consist of a composing room, proof room, stereotype room and press room. These production facilities are unique in the Tucson area.

73. There are trade associations whose memberships are limited to the newspaper industry.

74. There are trade publications which are directed solely to the newspaper industry.

75. There are labor unions whose membership is limited to employees of the newspaper industry.

76. Regular membership in the Associated Press is limited to owners of newspapers.

77. The Bureau of the Budget has established a separate Standard Industrial Classification for newspaper publishing and collects and reports data sep-

arately for the newspaper publishing industry.

78. The broadcast media are subject to regulation by the Federal Communications Commission; there is no comparable regulation of newspapers.

79. There is industry and public recognition of the newspaper publishing business as a separate industry.

80. One of the prime functions of a daily newspaper of general circulation is to provide complete and accurate coverage of the news in the community which it serves.

81. Star and Citizen each have a large staff of reporters whose job it is to gather and report local news.

82. Star and Citizen are the only media serving the Tucson area that each day provide such things as local society news, schedules of current local events, reports of births and deaths, movie schedules, and box scores of local baseball games.

83. Daily newspapers, weekly newspapers, radio, television and magazines all supply to the public news and advertising content.

84. The only other media that are engaged in the dissemination of state, national, and international news, together with extensive coverage of Tucson happenings, on a daily basis in Tucson, are the Tucson radio and television stations.

85. The first television station commenced operating in Tucson in 1952. In 1965, there were three commercial television stations, all with network affiliations and one noncommercial television station operating in the Tucson area. A fourth commercial television station has been licensed by FCC to operate in the Tucson area.

86. In 1940, there were two commercial radio stations operating in the Tucson area. In 1965, there were ten English-speaking, one FM, and two Spanish-speaking radio stations in the Tucson area.

87. All of the television stations and many of the radio stations in operation in Tucson employ a staff of reporters who gather and report news; they also subscribe to UPI or AP broadcast wire services. In addition, the radio and television stations having network affiliations receive and broadcast news programs provided by the network wire services.

88. Radio and television stations broadcast at times during the day local, state, national and international news and sports.

89. Radio station KOLD, a CBS affiliate, carries a total of between seven to eight hours of news on an average broadcast day. Television station KVOA-TV, a NBC affiliate, carries a total of four hours of news on an average broadcast day. Of course, some of this news is repeated in succeeding newscasts through the day.

90. The largest staff of reporters on any of the television stations in Tucson consists of four.

91. The leading news radio station in Tucson has a staff of three reporters which it shares with its affiliated television station.

92. The radio and television stations in Tucson neither attempt to nor do they in fact report news in general with the same depth of coverage as do Star and Citizen.

93. The wire services received by the newspapers are different than those received by the radio and television stations; the newspaper wire services report the news in greater detail.

94. A newspaper may be picked up and read at the convenience of the reader, whereas the news broadcast by radio or television stations can only be heard if the set is on at the particular time that the station is broadcasting it.

95. Newspapers constitute a permanent record of news and information; broadcast news is, by its nature, transitory.

96. The presentation of news is one of the primary objectives of television and because of the immediacy of news presentation by television, and its use of

documentary films, video tape for on-the-spot coverage and news commentators, this medium presents greater news coverage and more detail on certain important events than provided by other media.

97. Radio and television stations present editorial opinions which many times conflict with editorials appearing in Star or Citizen.

98. Only about 10% of the non-advertising space in the Star and Citizen is devoted to entertainment.

99. With respect to the radio and television stations in Tucson the smallest percentage of non-advertising time devoted to entertainment in 1964 was 74% for television and 52% for radio.

100. Leaving advertising out of consideration, Star and Citizen are primarily media of news whereas radio and television stations in Tucson are primarily media of entertainment.

101. Executives of radio and television stations in Tucson regularly read the newspapers for depth of coverage of the news.

102. Television and radio stations are able to broadcast on the scene coverage of news and sports events, a function which newspapers are unable to duplicate.

103. The United Press International issues different Stylebooks for its broadcast wires and its newspaper wires.

104. There are problems peculiar to writing for a broadcast medium that are significantly different from the problems connected with writing for a newspaper.

105. At least 82% of all the homes in the Tucson standard metropolitan area both subscribe to either Star or Citizen and have a radio set.

106. At least 78.8% of all the homes in the Tucson standard metropolitan area both subscribe to either Star or Citizen and have a television set.

107. The readers of Star and Citizen do not consider radio or television to be a substitute for these newspapers.

108. The weekly newspapers in Tucson do not attempt to and do not in fact cover the news to the same extent as Star and Citizen.

109. Defendants have advertised that "only the newspaper covers the news fully and in depth. There is no substitute for the daily newspaper.".

110. Defendants have advertised that "only the newspaper reader gets all the news."

111. With respect to the dissemination of news and information the Star and Citizen provide a unique service for which there are no available substitute products.

112. In addition to Star and Citizen, daily, weekly, and bimonthly newspapers, such as the Tucson American, a weekly delivered without charge, with a circulation over 88,000 in Pima County, the Arizona Republic, the Phoenix Gazette, the Sun News, Arizona Currents, Los Angeles Times, the New York Times, the Wall Street Journal and others are distributed within the Star-Citizen circulation area and disseminate to the public news and advertising matter. None of these newspapers provides the same coverage of news as do Star and Citizen. In 1964, the total circulation of out-of-town newspapers in the Tucson Standard Metropolitan Area was 3,379, as compared with Star and Citizen combined circulation of 73,799.

113. There have been periodic increases in both the subscription and newsstand prices of Star and Citizen during the period 1935 through 1964.

114. The minutes of meetings of the Board of Directors and executives of TNI which discuss circulation rates reflect no consideration of competing media as an obstacle to an increase in rates.

115. Star and Citizen have consistently increased circulation and circulation revenues despite the increases in both the subscription and newsstand prices of the papers.

116. The following table shows the net paid daily and combined daily circulations of Star and Citizen, in 1940

and in 1964, for the Tucson City Zone, the Tucson Standard Metropolitan Area, and total:

| Combined | 1940 | 1964 |
|---|---|---|
| City Zone | 16,214 | 71,850 |
| Standard Met. Area | 17,006 | 74,249 |
| Total | 23,295 | 85,634 |
| Star | | |
| City Zone | 8,553 | 33,528 |
| Standard Met. Area | 9,060 | 35,205 |
| Total | 12,192 | 43,096 |
| Citizen | | |
| City Zone | 7,661 | 38,322 |
| Standard Met. Area | 7,946 | 39,044 |
| Total | 11,103 | 42,538 |

117. Comparing the combined circulation of Star and Citizen with the occupied housing units in the Tucson Standard Metropolitan Area in the period 1940–1952, the circulation per housing unit in 1940 was .85 and in 1952 it was 1.00. The same comparison for the years 1953–1964 shows the circulation per housing unit as .98 in 1953 and .80 in 1964. In connection with these figures, it must be understood that in all of the years involved there were duplications in the circulation—that is, both papers were delivered at some houses—and that the percentage of duplications fell from 8% in 1946 to 4% in 1964. As to the Sunday Star, during the period 1954 to 1964 its circulation has increased in proportion to the increase in occupied housing units in the Tucson Standard Metropolitan Area.

118. During the period 1940–1964, the circulation revenues of Star and Citizen increased from approximately $122,000 to approximately $1,860,000.

119. The free distribution in Tucson since June, 1965, of 88,000 copies per week of the Tucson American, a weekly newspaper, has not affected the circulation of Star and Citizen.

120. Notwithstanding the introduction of television in Tucson in 1953 and its growth to three commercial stations by 1964, the circulation and the circulation revenues of Star and Citizen have increased steadily year after year.

121. As a result of the joint operation of Star and Citizen under the operating agreement, there has been no competition with respect to the circulations of these newspapers.

122. Because of the lack of competition Star and Citizen have not offered bargain subscription rates, have not engaged in significant promotion of their street sales, have not used promotional programs to sell subscriptions, and have been able to restrict the returns of newspapers from distributors.

123. Since at least 1950, Star and Citizen combined carrier promotion costs have been insignificant; in 1964, when net circulation revenues totalled $1,844,773, they amounted to $17,108. During the period 1950 through 1964, the annual carrier promotion costs of the newspapers, as a percentage of circulation revenue, decreased.

124. A great majority of the literate residents of Pima County feel and believe that the daily reading of the Star or Citizen, or both, is necessary in order to enable them to keep abreast of the news and to know of the products and services being offered for sale in Pima County in which they may be interested. No appreciable part of these readers would discontinue their reading of Star and Citizen by reason of an increase in the circulation rates of the papers, unless such increase was inordinate or palpably unreasonable.

125. The defendants have power over price with respect to the circulation of their newspapers.

126. From 1952 to 1966 there has been a substantial increase in the number of advertising media available in the Tucson area.

127. The media which sell broadcast time or space used to deliver advertising material to the public in the Tucson area are daily newspapers, weekly newspapers, radio, television, magazines, billboards, handbills, direct mailers, and telephone directory yellow pages.

128. The principal source of defendants' revenue derives from the sale of advertising space in Star and Citizen; in 1964 revenue from this source amounted to approximately 75% of total revenues.

129. With but minor exceptions the advertising revenues and lineage of Star and Citizen have increased each year during the period 1941 through 1964; during this period net advertising revenues rose from about $400,000 to about $6,500,000, and advertising lineage rose from 720,167 inches to 3,511,282 inches.

130. During the period 1940 through 1964, Star and Citizen revenue per inch of advertising sold increased from $0.55 to $1.82.

131. There are four basic categories of advertising sold by the defendants: local display, national display, classified, and legal. Of these four categories, the most significant both in terms of revenue and lineage is local display, which in 1964 accounted for $4,407,424 out of Star and Citizen's net advertising revenues of about $6,500,000, and for 2,430,248 out of a total of 3,511,282 inches of advertising space.

132. Star and Citizen are the only daily printed media of general circulation available to local Tucson advertisers.

133. Grocery stores and department stores in Tucson are the two largest advertisers in Star and Citizen. These department stores and most of these grocery stores have consistently concentrated their advertising in Star and Citizen, using other media primarily as a supplement to that advertising. Recently, some grocery stores in Tucson have used mailers, handbills, television, billboards, and radio; and some department stores have used radio, television, and circulars.

134. Besides Star and Citizen there are a number of weekly and bimonthly newspapers published in and around Tucson, such as the Tucson American, the Sun News, and the Arizona Currents, which sell advertising space in competition with TNI and the other advertising media.

135. The other printed media available to the local Tucson advertisers have limited and specialized coverage.

136. The end purpose of all commercial advertising is the distribution of sales information about a product or a service and, in the case of a local merchant, to attract customers to his place of business.

137. The selection and use of advertising media depends upon the type of advertising job to be done and the type of audience to be reached.

138. Advertising agencies, advertisers, and representatives of the various advertising media in the Tucson area recognize that there is lively competition among all advertising media in the area.

139. TNI, broadcast media, and outdoor advertising companies in Tucson employ national representatives to solicit national advertising in competition with other media.

140. Standard Rate and Data periodically publishes a service available to advertisers and advertising agents which contains the national advertising rates of radio, television, magazines, and newspapers and is used by advertisers and advertising agencies to determine comparative cost of media throughout the United States. This service is used by Tucson advertising agencies in selecting media for national advertising, i. e., advertising not directed to the Tucson market.

141. The rates per unit of time for advertising on radio or television are not directly comparable with advertising rates per line or per inch in printed media. However, each of the major advertising media in the Tucson area measures the coverage of its respective medium in the cost per thousand persons reached and uses these costs, plus the distinctive features of its medium, to compete for the advertising dollar.

142. All major advertising media in the Tucson area are in active competition

with each other. Advertisers and advertising agencies in selecting media give consideration to cost.

143. Salesmen from other media in soliciting advertising direct their sales efforts specifically against newspapers by emphasizing claims of lower cost and advertising advantages of their respective medium.

144. Advertising media are selected on the basis of the effectiveness of a particular medium and the results it produces and not on the basis of a comparison of prices.

145. The Bureau of Advertising, an adjunct of the American Association of Newspaper Representatives, assists newspaper representatives to compete against the other advertising media for the national advertising dollar.

146. The Institute of Outdoor Advertising supplies advertising and promotional materials to, and otherwise assists, outdoor advertising salesmen in Tucson and elsewhere to compete against newspapers and other media for local as well as national advertising.

147. The Television Advertising Bureau is a trade association which assists local television stations in Tucson and elsewhere to compete against newspapers and other media for local and national advertising expenditures and toward this end provides local television stations with sales and promotional materials to be used for soliciting advertising expenditures from newspaper advertisers.

148. Broadcast media salesmen compete with newspapers by claiming that a message carried in specific newspaper advertisements could be presented more effectively and at lower cost by radio or television.

149. The Radio Advertising Bureau (RAB) is most active in helping radio stations sell local and national advertising, and toward this end provides promotional materials aimed specifically against newspaper advertising. The Starch Report prepared by RAB has been used effectively by radio against newspapers in the sale of advertising in Tucson.

150. The Tucson Broadcasters Association is composed of members representing the radio and television business. Its purpose is to prepare sales presentations demonstrating to advertisers the advantages of advertising on radio or television rather than in newspapers.

151. There are production problems connected with television advertising that are not present with respect to newspaper advertising.

152. The maximum amount of consecutive commercial time that can be purchased on the Tucson radio or television stations is one minute; there is no comparable limitation in Star and Citizen.

153. It is not practical to advertise more than three items on a spot announcement on radio or television, while at least as many as fifty items can be advertised in a newspaper ad.

154. To the extent that advertisers desire a personalized approach in their advertising they are limited to the broadcast media and newspapers are not a feasible alternative.

155. Daily newspapers are the most satisfactory media for fulfilling the advertising needs of the firms merchandising large numbers of items at specific prices.

156. It is a common practice for advertisers to use other media, in addition to Star and Citizen, simultaneously.

157. Many advertisers use media in addition to the newspapers in order to reach an audience that they cannot reach by using newspapers alone, or to supplement their newspaper advertising.

158. There is a limited availability of desirable time spots on television; there is no comparable shortage in newspapers.

159. Radio and television pay commissions to advertising agencies on sales of local advertising but newspapers do not.

160. The circulation of newspapers is audited and accurate whereas radio and television audiences figures are only estimates.

161. Newspaper advertising rates are expressed in terms of space whereas television and radio rates are expressed in terms of time.

162. It is not feasible to compare the cost of advertising in newspapers with the cost of advertising in other media.

163. In setting their advertising rates, television and radio stations do not take into account the advertising rates of the Star and Citizen.

164. Star and Citizen offer advertisers substantially complete coverage which is not matched by any of the Tucson radio and television stations.

165. The quality and readership of a newspaper is a factor differentiating it from other advertising media. Advertising in a newspaper may be read and re-read at the convenience of the reader, whereas the advertising broadcast by radio or television stations is transitory. Newspapers are significantly different from other advertising media.

166. Radio and television stations in Tucson advertise in Star and Citizen because their listeners go to the newspapers to obtain information about the stations' programming.

167. The sales methods and materials used by radio, television, magazines, billboards, yellow pages, mailers and other advertising media have succeeded in diverting some local and national advertising expenditures from the newspapers.

168. Advertisers do not quit newspaper advertising and go to other media because of rate increases by the newspapers. Representatives of radio, television, and other media say from experience that an increase in newspaper advertising rates causes a limited number of newspaper advertisers to initiate or expand the use of other media, but it does not appear that such new or expanded use is important to newspapers or that it is either long continued or permanent.

169. There have been periodic increases in the local display advertising rates of Star and Citizen; between 1940 and 1964 the rate for a typical category of advertising space rose from $1.32 to $4.05.

170. With two minor exceptions the minutes of the meetings of the Board of Directors and executives of TNI which contain a discussion of the defendants' advertising rates reflect no consideration of other media as obstacles to increasing rates.

171. Defendants' decisions on rate increases have not been substantially affected by the existence of other advertising media.

172. Although Star and Citizen have on eleven occasions in the period 1941–1964 increased their rates for local display advertising, the revenues and lineage in this portion of their advertising business increased consistently. During the period 1941 through 1964: local display advertising revenues rose from $261,161 to $4,407,424; local display lineage rose from 458,828 inches to 2,430,248 inches; Star and Citizen revenue per inch of local display advertising sold increased from $0.56 to $1.75; and Star and Citizen local display advertising revenues increased at a greater rate than did total retail sales in the Tucson Standard Metropolitan Area.

173. During the period 1956 to 1964, the net operating revenues of TNI increased 78.4% and revenues from local and national advertising increased 81.4%. Total radio broadcast revenues in Tucson increased 129.8% and total television broadcast revenues in Tucson 84.2%.

174. During the period 1956 to 1964 in the Tucson area TNI local display advertising revenues increased 87.3%, television local advertising revenues increased 33.2%, and radio local advertising revenues increased 131.6%.

175. During the period 1956 to 1964 TNI's national display advertising revenues increased 47.6%, radio advertising revenues from national or regional advertisers and sponsors increased 229.8% and similar television advertising revenues increased 285.0%.

176. Between 1937 and 1940, Citizen, although losing money, was unable to raise its advertising rates because of the competition from Star.

177. Star and Citizen, since beginning joint operations in 1940, have increased their local display advertising rates at least twelve times.

178. Prior to the commencement of joint operations in 1940, Citizen, although losing money, sold advertising below the rates on its rate card because of the competition from Star. Since joint operations began, Star and Citizen have never sold advertising at a rate below that on their rate cards. This elimination of rate cutting resulted from elimination of competition in the daily newspaper business in Tucson.

179. A very substantial number of the persons who have products or services which they desire to offer and to sell to residents of Pima County feel and believe that advertising such products or services in the Star or Citizen, or both, is essential in order to enable them to reach a proper proportion of the potential buyers of their products and their services who reside in Pima County. No appreciable part of these advertisers would discontinue their advertising in Star and Citizen by reason of an increase in the advertising rates of those papers, unless such increase was inordinate or palpably unreasonable.

180. The existence of other advertising media in Tucson does not constitute an obstacle to the defendants' ability to increase the prices of advertising space in their newspapers.

181. Defendants have power over price with respect to the sale of advertising space in their newspapers.

B. *The Geographic Market*

182. The Bureau of the Budget defines a standard metropolitan area as "an integrated economic and social unit with a recognized large population nucleus"; and it classifies Pima County, in which Tucson is located, as a standard metropolitan area.

183. Since 1945, in excess of 80% of the combined daily circulation of Star and Citizen has been in Pima County.

184. With respect to some of its advertising, Star and Citizen differentiate between advertisers within Pima County and those outside of Pima County.

185. Pima County is considered by advertising agencies in Tucson to be the limits of their trading area.

186. The Audit Bureau of Circulations, an organization which audits circulation figures for newspapers, reports circulation figures for the Star and Citizen separately for Pima County.

187. Defendants in their promotional material have stressed the coverage of Star and Citizen in the standard metropolitan area.

188. In the operating agreement, Star Publishing and Citizen Publishing specifically provided that they, and their officers, stockholders, and administrative executives would not engage in any other publishing business in Pima County.

189. The Tuscon Standard Metropolitan Area (Pima County) is an appropriate section of the country under Section 7 of the Clayton Act and a relevant geographic market under Section 2 of the Sherman Act.

### RELIEF

190. The printing and distribution of Star and Citizen through joint use of substantially the same mechanical equipment does not depend upon the continuation of the price fixing, profit pooling, and market allocation agreements.

191. The restoration of competition to the daily newspaper business in Tucson requires that Star and Citizen have sep-

arate advertising departments and circulation departments.

192. It is impossible to predict with any substantial degree of completeness what the operating results of either newspaper will be in a competitive situation.

193. The fact that the Star has a Sunday edition while the Citizen does not would give Star an advantage in competing with Citizen for circulation and for advertising.

194. The organization of two separate advertising departments serving Star and Citizen will increase the cost to advertisers and advertising agencies by reason of time and expense involved in their preparing and placing advertising material.

195. A division between Star and Citizen of revenues on the basis of the circulation of each newspaper and/or advertising lineage placed in each newspaper would result from the papers having separate advertising and circulation departments; and increases in the cost of operation of the papers would also result from the establishment of such separate departments.

196. Assuming the continued joint use of the existing circulation trucks operated by TNI, the cost of operating separate circulation departments by Star and Citizen will likely be considerably greater than the cost of the single circulation department now operated by TNI, since a large number of circulation trucks probably will be required. The operation of separate circulation departments will require the employment of substantially more personnel than the number employed by TNI.

197. As to whether two newspaper companies could operate competing circulation and advertising departments servicing separate daily newspapers and also produce a joint Sunday edition, the only testimony in this case was expert opinion that even if two newspaper companies participated in a joint production agreement to produce weekday newspapers, the joint production of a Sunday issue would require a third editorial staff, would be difficult to operate, and would create many problems that would not otherwise exist.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over each of the defendants and over the subject matter of this action.

2. The 1940 operating agreement constitutes a price fixing, profit pooling and market allocation agreement illegal *per se* under Section 1 of the Sherman Act.

3. The defendants, by entering into and operating pursuant to the 1940 operating agreement, acquired monopoly power over the daily newspaper business in Tucson, in violation of Section 2 of the Sherman Act.

4. The defendants, in entering into the operating agreement of 1940, did so with the intent and purpose of eliminating all commercial competition in the daily newspaper business in Tucson, in violation of Section 2 of the Sherman Act.

5. The acquisition of Star by Arden in 1965 was in furtherance of, and a part of, a combination and conspiracy by defendants to monopolize the daily newspaper business in Tucson.

6. Defendants have combined and conspired to monopolize interstate trade and commerce.

7. The acquisition of Star by Arden in 1965 was an acquisition by one corporation engaged in commerce of another corporation engaged in commerce and was a violation of Section 7 of the Clayton Act.

8. Plaintiff is entitled to a decree directing divestiture of Star and modification of the operating agreement.

## JUDGMENT AND DECREE

The Court having this day made and entered its Findings of Fact and Conclusions of Law herein, it is now

Ordered, adjudged, and decreed:

1. The "Operating Agreement" entered into between Citizen Publishing Company and Star Publishing Company,

which became effective on July 1, 1940, provides for price fixing, profit pooling, and market allocations by the parties to the Agreement; and such provisions of the "Operating Agreement" are illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C., § 1.

2. The acquisition of all of the stock of Star Publishing Company by defendant Arden Publishing Company and the subsequent acquisition and ownership by defendant Arden Publishing Company of all of the assets of Star Publishing Company were and are in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

3. Defendants Arden Publishing Company and William A. Small, Jr., are directed to divest themselves of The Arizona Daily Star, either by defendant Arden Publishing Company selling the assets acquired by it from Star Publishing Company or by defendant William A. Small, Jr., selling and disposing of all of the stock of Arden Publishing Company.

4. Defendants, other than Star Publishing Company, shall within ninety (90) days from date of this judgment and decree lodge with the Court and serve upon plaintiff a plan which will provide for such divestiture and for the continuation of The Arizona Daily Star under ownership wholly free from any interests of or control by said defendants, or any of them. Such plan shall provide, as well, for the modification of the "Operating Agreement" so as to eliminate price fixing, market allocations, and profit pooling.

5. Defendants, and each of them, and each of their directors, officers, agents, and employees, and all persons acting for them, are hereby restrained and enjoined, effective upon divestiture, from in any manner or by any means fixing prices, or pooling profits, or allocating markets in the business of publishing daily newspapers of general circulation in Pima County, Arizona.

6. Jurisdiction of this cause is retained for the purpose of enabling any of the parties to apply to the Court at any time for such other orders and directions as may be necessary or appropriate in relation to the construction or carrying out of this judgment and decree, for the amendment or modification of any provisions hereof, or the enforcement of compliance therewith.