# CITIZEN PUBLISHING CO. ET AL. v. UNITED STATES.

No. 243.   Argued January 15, 1969.—Decided March 10, 1969.

*Richard J. MacLaury* argued the cause for appellants. With him on the briefs were *Francis N. Marshall, Thomas J. Klitgaard, John L. Donahue, Jr.,* and *George Read Carlock.*

*Daniel M. Friedman* argued the cause for the United States. On the brief were *Attorney General Clark, Solicitor General Griswold, Assistant Attorney General Zimmerman, Howard E. Shapiro, Charles D. Mahaffie, Jr.,* and *Gerald A. Connell.*

Briefs of *amici curiae* urging reversal were filed by *Arthur B. Hanson* for the American Newspaper Publishers Assn., and by *Robert L. Stern* for a number of newspaper publishers.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Tucson, Arizona, has only two daily newspapers of general circulation, the Star and the Citizen. The Citizen is the oldest, having been founded before 1900, and is an evening paper published six times a week. The Star, slightly younger than the Citizen, has a Sunday as well as a daily issue. Prior to 1940 the two papers vigorously competed with each other. While their circulation was about equal, the Star sold 50% more advertising space than the Citizen and operated at a profit, while the Citizen sustained losses. Indeed the Star's annual profits averaged about $25,825, while the Citizen's annual losses averaged about $23,550.

In 1936 the stock of the Citizen was purchased by one Small and one Johnson for $100,000 and they invested an additional $25,000 of working capital. They sought to interest others to invest in the Citizen but were not successful. Small increased his investment in the Citizen, moved from Chicago to Tucson, and was prepared to finance the Citizen's losses for at least awhile from his own resources. It does not appear that Small and Johnson sought to sell the Citizen; nor was the Citizen about to go out of business. The owners did, however, negotiate a joint operating agreement between the two papers which was to run for 25 years from March 1940, a term that was extended in 1953 until 1990. By its terms the agreement may be canceled only by mutual consent of the parties.

The agreement provided that each paper should retain its own news and editorial department, as well as its corporate identity. It provided for the formation of Tucson Newspapers, Inc. (TNI), which was to be owned in equal shares by the Star and Citizen and which was to manage all departments of their business except the news and editorial units. The production and distribu-

tion equipment of each paper was transferred to TNI. The latter had five directors—two named by the Star, two by the Citizen, and the fifth chosen by the Citizen out of three named by the Star.

The purpose of the agreement was to end any business or commercial competition between the two papers and to that end three types of controls were imposed. First was *price fixing.* The newspapers were sold and distributed by the circulation department of TNI; commercial advertising placed in the papers was sold only by the advertising department of TNI; the subscription and advertising rates were set jointly. Second was *profit pooling.* All profits realized were pooled and distributed to the Star and the Citizen by TNI pursuant to an agreed ratio. Third was a *market control.* It was agreed that neither the Star nor the Citizen nor any of their stockholders, officers, and executives would engage in any other business in Pima County—the metropolitan area of Tucson—in conflict with the agreement. Thus competing publishing operations were foreclosed.

All commercial rivalry between the papers ceased. Combined profits before taxes rose from $27,531 in 1940 to $1,727,217 in 1964.

The Government's complaint charged an unreasonable restraint of trade or commerce in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, and a monopoly in violation of § 2, 15 U. S. C. § 2. The District Court, after finding that the joint operating agreement contained provisions which were unlawful *per se* under § 1, granted the Government's motion for summary judgment.

The case went to trial on the § 2 charge and also on a charge brought under § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18.[1] The latter charge

---

[1] Section 7 provides in part:

"[N]o corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share

arose out of the acquisition of the stock of the Star by the shareholders of the Citizen pursuant to an option in the joint operating agreement. Arden Publishing Company was formed as the vehicle of acquisition and it now publishes the Star.

At the end of the trial the District Court found that the joint operating agreement in purpose and effect monopolized the only newspaper business in Tucson in violation of § 2 of the Sherman Act.

As respects the Clayton Act charge the District Court found that in Pima County, the appropriate geographic market, the Citizen's acquisition of the Star stock had the effect of continuing in a more permanent form a substantial lessening of competition in daily newspaper publishing that is condemned by § 7.

The decree does not prevent all forms of joint operation. It requires, however, appellants to submit a plan for divestiture and re-establishment of the Star as an independent competitor and for modification of the joint operating agreement so as to eliminate the price-fixing, market control, and profit-pooling provisions. 280 F. Supp. 978. The case is here by way of appeal. Expediting Act, § 2, 32 Stat. 823, as amended, 15 U. S. C. § 29.

We affirm the judgment. The § 1 violations are plain beyond peradventure. Price-fixing is illegal *per se.* *United States* v. *Masonite Corp.,* 316 U. S. 265, 276. Pooling of profits pursuant to an inflexible ratio at least reduces incentives to compete for circulation and advertising revenues and runs afoul of the Sherman Act. *Northern Securities Co.* v. *United States,* 193 U. S. 197, 328. The agreement not to engage in any other publishing business in Pima County was a division of fields also banned by the Act. *Timken Co.* v. *United States,*

---

capital . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

341 U. S. 593. The joint operating agreement exposed the restraints so clearly and unambiguously as to justify the rather rare use of a summary judgment in the antitrust field. See *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1, 5.

The only real defense of appellants was the "failing company" defense—a judicially created doctrine.[2] The facts tendered were excluded on the § 1 charge but were admitted on the § 2 charge as well as on the § 7 charge under the Clayton Act. So whether or not the District Court was correct in excluding the evidence under the § 1 charge, it is now before us; and a consideration of it makes plain that the requirements of the failing company doctrine were not met. That defense was before the Court in *International Shoe Co.* v. *FTC,* 280 U. S. 291, where § 7 of the Clayton Act was in issue.[3] The

[2] See Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 339 (1960); Hale & Hale, Failing Firms and the Merger Provisions of the Antitrust Laws, 52 Ky. L. J. 597, 607 (1964); Connor, Section 7 of the Clayton Act: The "Failing Company" Myth, 49 Geo. L. J. 84, 96 (1960).

The failing company doctrine was held to justify mergers in *United States* v. *Maryland & Virginia Milk Producers Assn.,* 167 F. Supp. 799, aff'd, 362 U. S. 458, and in *Union Leader Corp.* v. *Newspapers of New England,* 284 F. 2d 582.

For cases where the failing company doctrine was not allowed as a defense see *United States* v. *Diebold, Inc.,* 369 U. S. 654; *United States* v. *El Paso Gas Co.,* 376 U. S. 651; *United States* v. *Von's Grocery Co.,* 384 U. S. 270; *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 372, n. 46; *United States* v. *Third National Bank,* 390 U. S. 171.

[3] It should be noted that at the time the *International Shoe Co.* case was decided § 7 of the Clayton Act provided: "[N]o corporation . . . shall acquire . . . stock or other share capital of another corporation . . . where the effect of such acquisition may be to substantially lessen competition *between the corporation whose stock is so acquired and the corporation making the acquisition . . . .*" (Emphasis supplied.) Consequently, where the acquired company was "such as to necessitate liquidation," and where "the prospect for

evidence showed that the resources of one company were so depleted and the prospect of rehabilitation so remote that "it faced the grave probability of a business failure." 280 U. S., at 302. There was, moreover, "no other prospective purchaser." *Ibid.* It was in that setting that the Court held that the acquisition of that company by another did not substantially lessen competition within the meaning of § 7. 280 U. S., at 302–303.

In the present case the District Court found:

> "At the time Star Publishing and Citizen Publishing entered into the operating agreement, and at the time the agreement became effective, Citizen Publishing was not then on the verge of going out of business, nor was there a serious probability at that time that Citizen Publishing would terminate its business and liquidate its assets unless Star Publishing and Citizen Publishing entered into the operating agreement." 280 F. Supp., at 980.

The evidence sustains that finding. There is no indication that the owners of the Citizen were contemplating a liquidation. They never sought to sell the Citizen and there is no evidence that the joint operating agreement was the last straw at which the Citizen grasped. Indeed the Citizen continued to be a significant threat to the Star. How otherwise is one to explain the Star's willingness to enter into an agreement to share its profits

---

future competition . . . was entirely eliminated," it may have been reasonable to conclude that there was no more existing competition between the companies to be lessened by acquisition. 280 U. S., at 294. In 1950, however, § 7 was amended to make the measure of anticompetitive acquisitions the extent to which they lessened competition "in any line of commerce," rather than the extent to which they lessened competition "between" the two companies.

We have no occasion, however, to determine what changes, if any, that amendment had on the failing company doctrine.

with the Citizen? Would that be true if as now claimed the Citizen was on the brink of collapse?

The failing company doctrine plainly cannot be applied in a merger or in any other case unless it is established that the company that acquires the failing company or brings it under dominion is the only available purchaser. For if another person or group could be interested, a unit in the competitive system would be preserved and not lost to monopoly power. So even if we assume, *arguendo*, that in 1940 the then owners of the Citizen could not long keep the enterprise afloat, no effort was made to sell the Citizen; its properties and franchise were not put in the hands of a broker; and the record is silent on what the market, if any, for the Citizen might have been. Cf. *United States* v. *Diebold, Inc.*, 369 U. S. 654, 655.

Moreover, we know from the broad experience of the business community since 1930, the year when the *International Shoe* case was decided, that companies reorganized through receivership, or through Chapter X or Chapter XI of the Bankruptcy Act often emerged as strong competitive companies. The prospects of reorganization of the Citizen in 1940 would have had to be dim or nonexistent to make the failing company doctrine applicable to this case.

The burden of proving that the conditions of the failing company doctrine [4] have been satisfied is on those

---

[4] Bills·were introduced both in the 90th Congress (S. 1312 by Senator Hayden and H. R. 19123 by Mr. Edmondson) and in the 91st Congress (H. R. 279 by Mr. Matsunaga and H. R. 5199 by Mr. Johnson) to exempt from the antitrust laws joint operating agreements between newspapers because of economic distress. Extensive hearings were held in 1967 and 1968. See Hearings on S. 1312 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., pts. 1–6; Hearings on H. R. 19123 and Related Bills before the Antitrust Subcommittee of the House Committee on the Judiciary, 90th Cong.,

who seek refuge under it. That burden has not been satisfied in this case.

We confine the failing company doctrine to its present narrow scope.

The restraints imposed by these private arrangements have no support from the First Amendment as *Associated Press* v. *United States,* 326 U. S. 1, 20, teaches.

Neither news gathering nor news dissemination is being regulated by the present decree. It deals only with restraints on certain business or commercial practices. The restraints on competition with which the present decree deals comport neither with the antitrust laws nor with the First Amendment. As we stated in the *Associated Press* case:

> "It would be strange indeed . . . if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom. The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That Amendment rests on the assumption that the widest possible dissemination

2d Sess., ser. 25. The hearings reflect all shades of opinion. As stated by the House Subcommittee:

"The antitrust laws embody concepts and principles which long have been considered to be the bedrock of our economic institutions. Piecemeal exemptions from the antitrust laws to cope with problems of particular industries have been given reluctantly and only after there has been a clear showing of overriding need." Hearings, *supra,* ser. 25, p. 2. See Roberts, Antitrust Problems in the Newspaper Industry, 82 Harv. L. Rev. 319, 344–352 (1968); Flynn, Antitrust and the Newspapers, A Comment on S. 1312, 22 Vand. L. Rev. 103 (1968).

As of this date Congress has taken no action on any of those bills.

of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford nongovernmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests. The First Amendment affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity." 326 U. S., at 20.

The other points mentioned are too trivial for discussion. Divestiture of the Star seems to us quite proper. At least there is no showing of that abuse of discretion which authorizes us to recast the decree. See *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 185.

*Affirmed.*

MR. JUSTICE FORTAS took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring in the result.

When the owners of the Citizen and the Star embarked upon their joint venture in 1940, they did not believe that they were combining their commercial operations for all time. Rather, their contract provided that the venture would last for 25 years and that the relationship

would terminate in 1965 if both parties agreed to go their separate ways. It was only in 1953 that the parties agreed they would not permit their contract to expire in 1965 but would continue their relationship for another quarter century beyond the original termination date.

Nevertheless, both the Department of Justice and my Brethren have decided that the crucial question in this case is whether the original 1940 transaction could be justified on "failing company" grounds. Yet regardless of one's view of the 1940 transaction, the fact remains that if the parties had not renewed their agreement, full competition between the two newspapers would have been restored in 1965 and the Justice Department would never have begun the Sherman Act branch of this lawsuit. It would appear, then, that the decisive issue in this case is not the validity of the original 1940 transaction but the propriety of the decision taken in 1953 in which the term of the joint venture was extended by a quarter century beyond its original termination date.

In defense of the Court's approach, one may argue that if the 1940 agreement had provided that the newspapers' joint venture was to continue indefinitely, we would then have been required to decide this case on the basis of the situation prevailing at the time of the original transaction. In other words, if the agreement had been only slightly different it is arguable that we would have had no choice but to treat the transaction in the same way we would treat a total corporate merger. However this may be, I do not understand why the parties' decision to retain the advantages of flexibility should not be decisive for our purposes. If businessmen believe, after considering all the relevant factors, that future events may deprive their existing arrangements of utility, there is no reason why the antitrust laws should not view the transaction in a similar way.

While the trial court did not analyze the case in the way which I have suggested, it made sufficient factual findings to permit an evaluation of the legality of the 1953 decision extending the joint venture's term. The Court in effect found that in each year between 1940 and 1953, each newspaper operated at a profit. Moreover, in the decade preceding 1953, the joint venture's total profits increased with each succeeding year. Given this pattern of increasing profitability, I would hold that the "failing company" doctrine could not reasonably permit the two newspapers to extend the term of the agreement in 1953 at a time when it was impossible to predict whether full competition could be renewed in 1965.

Nor can the newspapers appropriately invoke the "failing company" defense to justify another quarter century's joint operation on the basis of the financial situation which actually existed in 1965. For the trial judge found that the joint venture's profits had continued their upward spiral with each year, reaching $1,727,217 in 1964, and that both the newspapers are now "in sound financial condition." 280 F. Supp. 978, 983. Moreover, in the quarter century since 1940, the number of households in the Tucson area has almost quadrupled, see Government's Exhibit 55, App. 452, and total circulation of the Star and the Citizen has increased proportionately. See Government's Exhibit 49, App. 448–450. While the District Court found it "impossible to predict" how well the two papers could compete without their present agreement, 280 F. Supp., at 993, I would hold that the joint venture's profitability required the companies to make a conscientious effort to operate independently before they could properly contend that their operating agreement was a business necessity.

Consequently, although I join in the Court's judgment in this case, I find it unnecessary to define the

circumstances in which a declining newspaper may properly act to assure its future independence as a news medium by entering into a joint operating agreement similar to the one challenged here.

MR. JUSTICE STEWART, dissenting.

Prior decisions of this Court have made it clear that a failing company cannot combine with a competitor if its independence could be preserved by sale to an outsider.[1] Today's decision for the first time lays down the blanket rule that the failing company defense is forfeited by a company which cannot show that it made substantial affirmative efforts to sell to a noncompetitor. That precise quantum and quality of proof may be a reasonable and effective prophylactic standard to ensure that the company could truly not have been sold. But proof of unsuccessful efforts to sell the company is not, as a logical, evidentiary matter, the only possible conclusive proof that it was not marketable. In many cases other evidence might make equally clear that any such efforts would surely have been fruitless. The Court's new rule, in other words, has validity only as a standard imposed on future conduct and not as an unrebuttable evidentiary presumption with respect to past events. Therefore, the inflexible enforcement of that rule should be limited to those who—unlike the appellants—were on notice of their obligation to be able to prove that they made tangible efforts, however futile, to find an outside buyer.

It cannot be said that the appellants in the District Court did not adduce convincing evidence that the Citizen was failing so woefully that no outsider would have considered purchasing it. On the contrary, they intro-

---

[1] *International Shoe Co.* v. *FTC*, 280 U. S. 291; *United States* v. *Diebold, Inc.*, 369 U. S. 654. Cf. *United States* v. *Third National Bank*, 390 U. S. 171, 190–192.

144

duced not only substantial evidence of the dire financial condition of the Citizen [2] and of the newspaper industry generally,[3] but also specific testimony by experts that in the prevailing business climate the Citizen could not possibly have been sold to an outsider.[4]  In the face of such an offer of proof, this Court does not find that the company was, in fact, salable.  It affirms the judgment only because of the appellants' failure to prove their defense in a particular way—a requirement imposed for the first time today.

[2] Small worked as publisher of the paper without a salary.  Yet as of December 31, 1939, Citizen Publishing owed approximately $79,000 to its stockholders for advances of working capital; it had current liabilities of over $47,000, as opposed to current assets of $16,525 in accounts receivable, $420 in bank deposits, and $66 cash on hand.  Its liabilities exceeded its assets, exclusive of goodwill, by some $53,400.

[3] "The period 1937 through 1943 constituted the most dismal era in 20th century newspaper history; more than half of the net decrease of daily newspapers since 1909 occurred during those seven years."  Ray, Economic Forces as Factors in Daily Newspaper Concentration, 29 Journalism Quarterly 31, 34 (1952).

[4] Newspaper brokers and publishers who testified that they were intimately familiar with the newspaper industry and aware of the situations of the Citizen and the Star, gave their opinions that there was no market for the Citizen unless it could somehow be joined with the Star.  *E. g.:*

"Mr. MANNO: I do not think that the Citizen Publishing Company was salable in 1940, except on what I would describe as a distress basis.

"Mr. MACLAURY: Would it have been salable to an outside publisher who intended to, or who would have had a reasonable expectation of operating Citizen at a profit?

"Mr. MANNO: No, sir, its potential salability would be based on the possibility of a prospective purchaser contemplating that he could possibly buy it and then go into a mutual production plan with the Star, or resell the Citizen to the Star at a potential profit."

It does not appear that any testimony to the contrary was introduced by the Government.

The District Judge did not resolve the central factual issue against the appellants. He made no finding that the company was salable. Indeed, the judge refused even to consider the appellants' evidence in connection with the issues under § 1 of the Sherman Act. With respect to the § 1 count, he excluded the evidence altogether on the erroneous ground that the failing company defense was wholly unavailable to participants in the kind of joint operating agreement involved in this case. And while he admitted the evidence at trial on the other counts, he explicitly limited its relevance to the question of the bona fides of the Star owner's belief that his company was not monopolizing the market. In view of these rulings and the absence of any pertinent findings, it is clear that the appellants have not had their day in court on the critical issue in this case.

The District Court did find that

> "at the time the agreement became effective, Citizen Publishing was not then on the verge of going out of business, nor was there a serious probability at that time that Citizen Publishing would terminate its business and liquidate its assets unless Star Publishing and Citizen Publishing entered into the operating agreement." 280 F. Supp. 978, 980.

I do not believe this finding supports the conclusion that Citizen was not a failing company, or even that the District Court thought it was not a failing company. Every other material finding of the District Court was to the effect that Citizen was dying.[5] The only subsidiary finding consistent with the conclusion that Citizen was not then on the verge of *immediate* demise was that Small, by his own admission, was "prepared to

---

[5] See, *e. g.*, the following two specific findings:

"12. From 1932 to 1940, Citizen Publishing operated at a substantial loss. Its losses were defrayed by contributions made by its

finance the losses of Citizen Publishing for some little time thereafter from resources available to him other than the earnings or assets of Citizen Publishing." *Id.,* at 980.

As stated above, the District Judge mistakenly thought that the failing company defense was unavailable in a case like this under § 1 of the Sherman Act. But he made clear his view that, if the failing company defense had been available—as in a total merger, for example— that defense would have prevailed:

> "Mr. MacLaury: Well, would Your Honor then think if they had dissolved Star or Citizen or both and simply merged them all into one company, then the failing company doctrine would apply?
>
> .    .    .    .    .
>
> "The Court: I think if Star acquired all of Citizen's assets and gave stock to the owners of Citizen, it probably would. *I would say that the Government wouldn't have much chance in this particular case of attacking that acquisition.*" (Emphasis supplied.)

Because the question whether Citizen was a failing company has not yet been properly determined, I would vacate the judgment and remand the case to the District Court, so that this dispositive question may be fully canvassed.

---

stockholders. Star Publishing from 1932 to 1940 operated at a profit.

.    .    .    .    .

"15. For many years prior to 1940, Citizen Publishing had been unable to pay a dividend. Prior to 1940, Mr. Small, Sr., received no salary and by March, 1940, Citizen Publishing owed debts of more than $109,000. Of this indebtedness, about $79,000 was to stockholders of Citizen Publishing."