**AUTOMATED BUILDING COMPONENTS, INC., Plaintiff,**

v.

**TRUELINE TRUSS CO., Inc., and Gerald M. McCormack, Defendants.**

**Civ. No. 67–230.**

United States District Court,
D. Oregon.

April 16, 1970.

Rives & Schwab, Portland, Or., Le-Blanc & Shur, Washington, D. C., for plaintiff.

Buckhorn, Blore, Klarquist & Sparkman, Portland, Or., for defendants.

OPINION

SOLOMON, Chief Judge.

Automated Building Components, Inc. (ABC) seeks to hold Trueline Truss Co. (Trueline) and Gerald M. McCormack in contempt of this Court's consent decree

in Civil No. 67–230. That decree enjoined Trueline and McCormack from infringing ABC's United States Patent 3,304,106.

Trueline and McCormack filed a counterclaim against ABC for damages for violations of the Sherman and Clayton Acts.

## INFRINGEMENT

ABC manufactures no-nail connector plates for use in the prefabrication of wood roof trusses. Roof trusses are frames which hold roofs. Wood roof trusses are constructed from wood beams, and the connector plate holds the beams together.

A no-nail connector plate is a metal plate with teeth that are perpendicular to the plate. In the construction of a truss joint, two wood beams are placed side by side and are sandwiched between two connector plates. A truss-making machine then presses the teeth of the plates into the beams so that the plates will hold the beams together. Other connector plates require nails, but because of labor costs these plates are more costly to use than no-nail plates.

In the early 1960's, Gerald McCormack was ABC's chief engineer and assistant manager at the company's principal plant in Florida. In the spring of 1962, McCormack left ABC to open his own business. He moved to Lake Oswego, Oregon, and there he organized Component Engineering Co. (Component) to manufacture and sell connector plates and prefabricated wood roof trusses.

After he left ABC, McCormack designed a connector plate. Figure 1 shows a top view and Figure 2 an end view.

Figure 1

Figure 2

[A2294]

This plate has long, barbed teeth and short, triangular teeth which face diagonally across the plate. The short teeth provide shear resistance—that is, they prevent the connected beams from sliding against each other or from pulling apart. The long teeth provide shear resistance plus withdrawal resistance—that is, they prevent the connector plate from pulling out of the wood. McCormack placed the teeth so that the base of the plate has continuous bands of metal running the length and width of the base and running diagonally across the base.

In designing this plate, McCormack relied on the classical theory that the more barbs on a tooth, the greater the withdrawal resistance. It is the root of the long tooth that first fails under stress. McCormack therefore put as many barbs as he could on his long tooth, but he left room below the last barb so he could broaden the "shank" of the tooth before it connected to the base of the plate.

Connector plates were well known in the art. Both the Menge Plate and the "J" Series Plate used long, barbed teeth.

The Menge Plate, United States Patent 3,011,226, issued December 5, 1961, had one barb on each tooth (Figure 3).

Figure 3

[A2293]

Below the barb, Menge gradually broadened the shank of the tooth until a point just above the base of the plate. At that point, Menge abruptly widened the shank for a short distance and then ran the shank at right angles into the base.

The "J" Series Plate, which was described in a printed publication in 1962, had two barbs on each tooth. Figure 4 is a top view of this plate, Figure 5 a top view of a tooth, and Figure 6 a side view of a tooth.

Figure 5

Figure 4

Figure 6

[A2292]

In September, 1963, McCormack filed a patent application for the connector plate that he designed. At the same time, he assigned the application to Component.

In the winter of 1964–1965, Component suffered flood damage. Against McCormack's will, a majority of Component's shareholders voted to liquidate the business. Component assigned its assets to the Oregon Association of Credit Management, Inc., and the Association sold the patent application at a public auction to Air-King Manufacturing Co. (Air-King), ABC's sole Oregon franchisee. Air-King then assigned the application to ABC.

After the sale, McCormack went back into business. He organized Trueline Truss Co. and continued to use the plate in the manufacture of prefabricated wood roof trusses.

In January, 1966, the United States Patent Examiner rejected all claims in the application. ABC's patent counsel then cancelled eight of the claims, rewrote claims 4 through 7, and reasserted the eight remaining claims.

Claim 2 of the original patent application was one of the cancelled claims. This claim sought to patent:

"A toothed connector plate for fastening together and transmitting loads between abutting structural wood members, said plate comprising:

a) a flat, metal plate member,

b) a plurality of integral, spaced apart fastening means extending unidirectionally from and in a direction substantially normal to said plate member for embedding into said abutting members,

c) said fastening means including a plurality of relatively short tooth means having broad sides and straight edges so as to have a high resistance to shear in wood but a low resistance to withdrawal therefrom,

d) said short tooth means being distributed substantially uniformly throughout at least one-half the surface of said plate member,

e) others of said fastening means including a plurality of elongate tooth means of considerably greater length than said short tooth means so as to have a higher resistance to withdrawal from wood,

f) said elongate tooth means being distributed throughout at least the other half said surface area of said plate members."

Claim 5 of the original application sought to patent:

"A toothed connector plate according to claim 2 wherein said elongate tooth means are provided with a pair of opposed, relatively broad sides having a width at least twice the thickness thereof, said broad sides of said elongate tooth means facing in a direction longitudinally of said plate member and said broad sides of said short tooth means facing diagonally across said plate."

ABC rewrote claim 5 as claim 22 of the amended application by repeating paragraphs (a) through (f) of claim 2 and adding paragraph (g), which contained language substantially the same as the language of claim 5.

The Patent Examiner rejected claims 2 and 5 of the original application as unpatentable on the basis of Vogel (Patent 705,626), which claimed as novel a metal strap which had long and short teeth. The Examiner held that the placement of the teeth on McCormack's plate was not of sufficient importance to distinguish the plate from the Vogel strap.

When ABC filed the amended application, it asserted that the placement of the teeth was of great importance:

"[N]one of the references in any way suggest the novel connector plate of this invention having the diagonally directed short teeth * * * or a tooth arrangement having longitudinal, transverse and diagonal continuous metal webs or strips * * *. As described in the instant specifica-

tion, this particular novel structure importantly contributes to the improved operation of the plate of this invention in terms not only of shear resistance but also plate strength in all directions so as to form a much stronger joint resistant to variable as well as static loads * * *.

"* * * As is well known, one of the most important factors in plate cost (I.E. amount of metal used) is determined by the plate thickness so that any tooth arrangement and disposition which substantially improves the joint such as the diagonal disposition of the present invention and the accompanying continuous metal strands without at the same time increasing the necessary thickness of the plate, constitutes just such an important change in construction warranting the patent protection herein sought."

Claim 7 of the original application sought to patent:

"A toothed connector plate according to claim 2 wherein both edges of each said elongate tooth means are provided with a plurality of barbs along substantially the entire length of said edges, each of said barbs including an edge portion extending generally longitudinally of said tooth means and an abrupt shoulder extending generally laterally outwardly of said shoulder."

ABC rewrote claim 7 as claim 24 of the amended application by repeating paragraphs (a) through (f) of claim 2 of the original application and adding paragraph (g), which contained language substantially the same as the language of claim 7.

The Patent Examiner rejected claim 7 of the original application because of Vogel's invention.

In September, 1966, the Patent Office issued a Notice of Allowance of all claims of the amended application, including claims 22 and 24, which were renumbered as claims 2 and 4.

In February, 1967, the application issued as United States Patent 3,304,106.

McCormack continued to manufacture the Patented Plate. In April, 1967, ABC filed this action against Trueline and McCormack for infringement. In August, 1967, the Court, by stipulation of the parties, entered a consent decree in which the Court decreed that all claims of the patent were valid, and that Trueline and McCormack had infringed claims 2, 3, 4, 6, and 7 of the patent. The decree enjoined Trueline and McCormack from further infringement.

Thereafter, McCormack designed a new plate (Accused Plate). Trueline began using this plate in its trusses (Figure 7).

Figure 7

[A2291]

In April, 1968, ABC filed this motion for contempt, asserting that the Accused Plate infringed claims 2 and 4 of the patent.

Trueline and McCormack cannot raise the issue of validity because by agreement of Trueline and McCormack this Court entered a consent decree holding the patent to be valid.

■ Trueline and McCormack contend that the Accused Plate does not infringe claim 2 because the plate does not have diagonally facing short teeth, as required by paragraph (g) of claim 2, and does not infringe claim 4 because the long teeth do not have barbs over substantially their entire length, as required by paragraph (g) of claim 4.

I agree.

Paragraph (g) of claim 2 and paragraph (g) of claim 4 are not mere surplusage. Claim 2 of the original application described a plate with long and short teeth. This claim did not require that the short teeth face diagonally across the plate or that the long teeth have barbs over substantially their entire length. After the Patent Examiner rejected all claims of the original application, ABC withdrew this claim. ABC then concentrated on claims which included the additional requirements of either diagonally facing short teeth or long teeth with barbs over substantially their entire length.

In the amended application, ABC expressly distinguished claim 22 (claim 2 of the issued patent) from prior art on the basis of the diagonal placement of the short teeth. Now, ABC asserts that if the Patented Plate were long and narrow then short teeth on a diagonal line between corners of the plate would be nearly parallel to the sides of the plate. ABC argues that the difference between short teeth on this diagonal line and short teeth on a line parallel to the sides of the plate would be so small that it would be improper to distinguish between these teeth.

■ ABC is estopped to make this argument, which in effect would require me to disregard the word "diagonally"

in claim 2, because it is contrary to ABC's assertion in the amended application that the diagonal placement of the short teeth was an important change which distinguished ABC's plate from prior art. This present argument also is contrary to the drawings in the issued patent, which show that ABC intended that the short teeth be at 45 degree angles to the sides and ends of the plate rather than on a line between the corners of the plate. In a case such as this, where the patent applicant claims a novel combination of old elements, "the patent is infringed only if all of the elements set forth in the claim are found in the accused device." Nelson v. Batson, 322 F.2d 132 (9th Cir. 1963).

The importance of the diagonal placement of the short teeth is illustrated by the difficulties McCormack encountered when he designed the Accused Plate. When McCormack placed the short teeth so that they do not face diagonally across the plate, he lowered the plate's shear resistance. He had to compensate for this by making the short teeth 16% larger than the teeth of the Patented Plate. Because the short teeth are larger, the holes in the base are larger and the base itself is weaker. McCormack had to compensate for this by making the plate 20% thicker than the Patented Plate. This increased McCormack's metal cost by 20%.

I find that the diagonal placement of the short teeth is an essential element of claim 2 of ABC's Patent and that the Accused Plate does not contain this element. See Nelson v. Batson, supra. I also find that file wrapper estoppel prevents ABC from disregarding the requirement that the plate have diagonally facing short teeth. D & H Electric Co. v. M. Stephens Mfg., Inc., 233 F.2d 879 (9th Cir. 1956). The Accused Plate therefore does not infringe claim 2 of the patent.

ABC contends that claim 4, which requires that the long teeth have barbs over substantially their entire length, covers the Accused Plate either because the long teeth in fact have barbs over

substantially their entire length or because the long teeth are the equivalent of teeth with barbs over substantially their entire length.

Patented Plate
Figure 8
[A2290]

ABC and Trueline do not agree on what constitutes a "barb." Trueline asserts that a barb consist of the two edges A and B (see Figures 8–10).

Accused Plate
Figure 9

Menge Plate
Figure 10

ABC asserts that a barb consists of the three edges A, B, and C.

I agree with Trueline, whose definition is supported by common sense as well as by the language of claim 4. If ABC's definition were correct, then the Menge Plate would have long teeth with barbs over substantially their entire length, and would have anticipated the claimed invention of ABC's patent.

Using either definition, however, I do not believe the long teeth of the Accused Plate have barbs over substantially their entire length.

 ABC did not expressly distinguish claim 24 (claim 4 of the issued patent) from prior art. A distinction on the basis of the barbs over substantially the entire length of the long teeth, however, is implied by the file wrapper because this was the only requirement that made claim 24 different from cancelled claim 2 of the original application. "It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220–221, 61 S.Ct. 235, 239, 85 L.Ed. 132 (1940). *See also* D & H Electric Co. v. M. Stephens Mfg., Inc., *supra*. On this history of the patent prosecution, ABC is estopped to assert that I should disregard the requirement that the long teeth have barbs over substantially their entire length.

Neither do I believe that the long teeth of the Accused Plate are the equivalent of the long teeth of the Patented Plate. The Patented Plate is a narrow improvement in a crowded field. ABC therefore is entitled only to a narrow range of equivalents. Nelson v. Batson, *supra*. The two-barbed tooth of the Accused Plate, which is similar to the two-barbed "J" Series tooth and the one-barbed Menge tooth, does not fall within this narrow range. The Accused Plate therefore does not infringe claim 4 of the patent.

As an additional defense to the infringement action, defendants assert that ABC misused the patent and therefore is not entitled to enforce it against defendant. The facts on which defendants rely for this defense are the same as those upon which they rely for the antitrust counterclaims. On the facts and for the reasons set forth in the antitrust portion of this opinion, I find that ABC is guilty of patent misuse and is

not entitled to enforce the patent against the defendants.

Since the Accused Plate does not infringe either claim 2 or claim 4 of ABC's patent, and since ABC is not entitled to enforce the patent against defendants because of patent misuse, the motion for a contempt judgment is denied.

### ANTITRUST COUNTERCLAIM [1]

Defendants McCormack and Trueline contend that since 1962, ABC and Air-King have participated in a continuing conspiracy to prevent McCormack from competing with Air-King in the manufacture and sale of wood roof trusses. Defendants contend that ABC, in carrying out this conspiracy, acquired the patent and used it to harass defendants. Defendants assert that as a result of this conspiracy, defendants were eliminated from the industrial truss market and were subjected to higher costs in the manufacture of residential trusses. Defendants contend that ABC's actions constitute violations of the Sherman and Clayton Acts.

I find that defendants' contentions are valid and that ABC violated section 1 of the Sherman Act and section 7 of the Clayton Act.

ABC is probably the largest manufacturer of no-nail metal connector plates in the United States. No-nail plates are more economical than nail plates and have achieved widespread commercial success.

The construction of wood roof trusses from no-nail plates requires the use of heavy machinery. Plate manufacturers do not sell their plates directly to builders. They sell their plates to truss manufacturers, who construct trusses at prefabrication plants and then sell the trusses to builders.

ABC manufactures a special plate, the Gang-Nail Plate, and it owns the basic patent on this plate, the Jureit Patent (No. 2,877,520). ABC sells its Gang-Nail plates to franchised truss manufacturers throughout the nation. Air-King and Mercer Manufacturing Co. (Mercer) are ABC's franchisees in Oregon and Washington. Five other truss manufacturers, including defendant Trueline, compete with Air-King and Mercer for the Oregon-Washington market. These other manufacturers do not purchase their connector plates from ABC. Defendant Trueline manufactures its own plates. Air-King is probably the largest truss manufacturer, followed by Dwyer Lumber Co., Mercer, and Trueline.

Trueline competes only for the industrial truss market. It cannot compete for the residential truss market because the changes McCormack made in the plate to avoid infringing the patent increased Trueline's metal cost by 20%.

When McCormack left ABC in 1962, he told Jureit that he intended to open his own wood truss business. Jureit answered that he hoped he would not have to sue McCormack to put him out of business.

After McCormack organized his first company, Component, he achieved a significant position in Air-King's Oregon-Washington market. Air-King's president, Van S. Camp, at first thought that ABC was beginning to manufacture trusses in Oregon. When he complained to ABC, he learned that McCormack no longer worked for ABC, but was in business for himself. Camp disliked McCormack because McCormack was a cutthroat competitor, and Camp wrote ABC that McCormack even engaged in giveaway pricing.

When McCormack left ABC, he took a book which contained his personal truss designs. In the winter of 1963, ABC filed an action against McCormack to force him to give the book to ABC. ABC did this without ever informing McCormack that ABC believed it was entitled to the book and without making a demand that McCormack return it. ABC immediately wrote Camp about this action. ABC stated in its letter that it initially had intended only to

---

1. At the trial, I segregated the issue of damages for trial at a later date.

bring this single action against McCormack. ABC stated, however, that it had reconsidered when it learned that McCormack's company was achieving a significant position in Air-King's market. ABC stated that because of McCormack's success, it had decided to bring two other actions against McCormack, one for wrongfully inducing two men to leave ABC's employ and the other for infringing the Jureit Patent.

On receiving this information from ABC, Camp asked ABC to keep him informed on the progress of the litigation, and he offered his company's assistance in any action against McCormack.

Although McCormack believed that he was entitled to keep the truss design book, he was not using the designs and did not intend to use them. He therefore permitted ABC to take a consent judgment. ABC did not bring an action against McCormack for inducing the two men to leave ABC's employ. Neither did it file an action for infringement of the Jureit Patent because that patent had been held invalid in two infringement actions against other plate manufacturers. Automated Building Components, Inc. v. Structomatic, Inc., 362 F. 2d 529 (7th Cir. 1966); Automated Building Components, Inc. v. Hydro-Air Engineering, Inc., 362 F.2d 989 (8th Cir. 1966).

On March 28, 1965, Camp saw a notice advertising the Component liquidation sale. The next day, he inspected the Component plant. He decided that he could not afford to purchase the Component assets, but he called ABC to see if ABC would buy the assets from him if he purchased them at the sale. ABC promised Camp that it would pay him up to $10,000 for McCormack's patent application and for any equipment that was necessary to manufacture McCormack's plate.

Camp also attempted to interest other connector plate manufacturers in purchasing Component's assets from him. According to Camp, ABC was the only manufacturer in the country that was willing to purchase these assets.

At the sale, only Camp, McCormack, and Component's creditors bid for the assets. Camp bid on every asset which he believed McCormack might be able to use to go back into business. Camp won the bidding on the patent application, a die, a truss-making machine, and some minor equipment. Camp also intended to purchase Component's left-over connector plates, but the auction was so confusing that McCormack out-bid him for these plates. The only assets Camp did not bid on were some die parts. He did not bid on these because he believed they were useless. Later, when he learned that the die parts could be used to manufacture plates, Camp wrote ABC that he should have purchased these parts.

Camp would not have purchased any of Component's assets had it not been for ABC's promise to buy the assets from him.

On the following day, before Camp paid for the Component assets, ABC credited $6,580.00 to Air-King's account for the patent application, the die, and the truss-making machine. Camp then paid for these assets.

McCormack's patent application was the only application ABC ever acquired except for applications it acquired from its own employees.

Sometime later, Camp notified ABC that McCormack was back in business as Trueline Truss Co. and that the new company was filling old Component orders using the same plates Component had used. Camp asked ABC if the patent application could be used to prevent Trueline from using these plates.

ABC wrote Camp that it could not stop McCormack from using the plates until the patent actually issued. ABC advised Camp that if he wanted to fight McCormack's competition he should hire local counsel to investigate defendants and see if they could find some action that could be brought against defendants. ABC suggested that McCormack might be guilty of violating Oregon credit laws or of unfair competition. ABC offered to reimburse Air-King for

"any limited amount of legal fees," and ABC kept after Air-King to follow up these possible claims against McCormack.

The patent issued in February, 1967. Two months later, ABC filed this action, without giving defendants notice that the patent had issued. ABC did this even though it knew that the principal claims of the basic patent, the Jureit Patent, had been declared invalid and that the patent involved here would probably be held invalid if its validity was contested. ABC had not and did not intend to manufacture the Patented Plate, and it had not given any franchisee a license to manufacture the Plate. In August, 1967, ABC obtained the consent decree in this case, which provided that the patent was valid and infringed. That decree enjoined defendants from further infringement, but it did not award ABC any damages and it provided that each party should bear its own costs.

In February, 1968, Camp complained to ABC that Trueline was still in business and was still underbidding Air-King for large contracts. Camp again asked ABC what could be done. ABC answered that its patent counsel was preparing to seek a contempt judgment against defendants.

In April, 1968, ABC filed this motion for a contempt judgment. Again, ABC acted without giving defendants notice. ABC filed this motion, knowing that McCormack had already given it two consent decrees and knowing that McCormack had made substantial changes and had substantially increased his metal costs when he designed the Accused Plate.

■ Section 1 of the Sherman Act forbids conspiracies to restrain interstate commerce. 15 U.S.C. § 1. I find that ABC and Air-King conspired to harass defendants and to force defendants out of the truss manufacturing business. As a result of this conspiracy, ABC and Air-King forced defendants out of the Oregon-Washington residential truss market and made it difficult for them to compete in the industrial truss market.

It may be true that Air-King, which is not a defendant here, instigated the conspiracy and is more culpable than ABC. That does not excuse ABC, however, because ABC knowingly and wilfully participated with Air-King in a joint effort to eliminate defendants from the truss business.

I find that ABC violated section 1 of the Sherman Act.

Section 7 of the Clayton Act forbids a corporation to acquire the assets of another corporation if the acquisition will substantially lessen competition in any line of commerce. 15 U.S.C. § 18.

ABC contends that Component was being liquidated at the time ABC acquired the Component assets, and that the Clayton Act does not forbid the acquisition of the assets of a failing corporation.

■ The Clayton Act permits a corporation to acquire the assets of a failing competitor only if no other bona fide prospective purchaser is available. Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Here, McCormack was a bona fide prospective purchaser.

■ I find that ABC's acquisition of the Component assets violated section 7 of the Clayton Act.

This opinion will constitute findings of fact and conclusions of law under Rule 52(a), Fed.R. Civ.P.

This case will be set for the June Call, at which time the parties may submit an amended Pretrial Order on the issue of damages and attorneys' fees.