**William Thomas WATKINS, Plaintiff,**

v.

**KWIK PHOTO, INC., et al., Defendants.**

**Civ. A. No. 73E–36(R).**

United States District Court,
S. D. Mississippi, E. D.

Dec. 11, 1975.

James E. Sandusky and H. C. "Mike" Watkins, Meridian, Miss., for plaintiff.

Roy Pitts, Meridian, Miss., for defendants.

---

## OPINION

DAN M. RUSSELL, Jr., Chief Judge.

Claiming jurisdiction under 28 U.S.C. § 1337, and Section 4 of the Clayton Anti-Trust Act, 15 U.S.C. § 15, William Thomas Watkins of Jackson, Mississippi, initially filed suit for various anti-trust violations against Kwik Photo, Inc., a Mississippi corporation; James F. Thompson, Jr., Charles Norman Byrd, John Thompson and S. A. Rosenbaum, Mississippi residents; Kolor Print, Inc., an Arkansas corporation, and Alabama photo Service, Inc., an Alabama corporation.

Prior to a trial on the merits, plaintiff dismissed John Thompson from the action, settled with S. A. Rosenbaum, Kolor Print, Inc., and Alabama Photo Service, Inc., and at the conclusion of his evidence, dropped all claims except those founded on Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, as they apply to Kwik Photo, Inc., James F. Thompson, Jr. and Charles Norman Byrd.

The gravamen of plaintiff's claims of anti-trust violations grows out of a franchise agreement entered into by plaintiff on July 25, 1969, with defendants Thompson and Byrd, referred to therein as franchisors. The agreement acknowledged that the franchisors owned and operated a business system known as "Kwik Photo" and was also in the business, by agreement, of licensing to others the right to operate and maintain retail photographic supplies and provide the quick service of processing and developing of exposed films, using the name of "Kwik Photo."

As in most cases involving alleged anti-trust violations, a factual background is helpful.

Plaintiff, 20 years old at the time of his entering into the franchise agreement, was then a resident of Meridian, Mississippi, with experience as an air force photographer, but with no business training or experience in the processing of film other than black and white. In June 1969, plaintiff had a part time business of picking up exposed film at small food stores in Meridian and delivering the film to Thompson and Byrd, incorporators and major stockholders of Instant Photo, Inc., incorporated in Meridian on June 19, 1969. This corporation was not only authorized under its charter to sell, service and process film, and operate retail photographic stores for the sale of film and photographic supplies, but to engage in the franchising, leasing or sale of any and all types of photographic materials, cameras and related equipment, and to acquire territorial rights to operate as a manufacturer, agent, dealer or warehouser in connection with the processing of film and the sale of related products. At that time Thompson and Byrd and/or Instant Photo had only one outlet, being at the Broadmoor Mart, Meridian. Because the name "Instant Photo" was registered to others than the Franchisor, Thompson and Byrd, and subsequently their corporation, operated out of their drive-in booth (outlet) in the Broadmoor Mart under the trade name of "Kwik Photo" and on September 18, 1970, Thompson and Byrd changed the name of their corporation from Instant Photo, Inc. to Kwik Photo, Inc. S.A. Rosenbaum, no longer a defendant, was also a stockholder. This information is relevant only in so far as reflecting that plaintiff dealt with Thompson and Byrd for a franchise under the name of Kwik Photo.

In May and June 1969, plaintiff, the sole witness for himself other than Thompson as an adverse witness, testified that he discussed with Thompson

and Byrd his interest in getting into the Kwik Photo business. He at all times recognized the value of quick and economical processing of film for the public. Thompson and Byrd were not interested in plaintiff's participation in their profitable venture, except to the extent of working out a franchise agreement. Plaintiff continued to observe the defendants' volume of business and method of operation, including counting the rolls of film being sent by Thompson and Byrd to Kolor Print, Inc., an Arkansas corporation, for processing. As noted above, Kolor Print, Inc. is no longer a defendant. Plaintiff testified that Thompson and Byrd assured him that "Kwik Photo" was a registered trade mark name and that they had the good will of this name and good contacts with their Arkansas processor. They also gave plaintiff assurances that they were clearing $1,500.00 monthly from their Kwik Photo operation and were opening a second outlet at another Meridian location. With this knowledge and his own investigation, plaintiff determined to accept a franchise arrangement. The cost of each location was $6,000.00. After first considering franchises for four locations in Jackson, Mississippi, plaintiff was told that city ordinances prevented the location of a portable booth, such as that housing a Kwik Photo outlet, in the absence of sanitary facilities. Plaintiff finally agreed to have two locations, one each in Hinds and Rankin Counties, paying to Thompson and Byrd the sum of $12,000.00 cash. In return plaintiff received an 8' x 10' portable building, or booth, for each location, plus a show case, an adding machine, an air conditioning unit, advertising signs, display racks, and an inventory of film and equipment for mailing same for each booth. Plaintiff conceded that the defendants, in granting him the exclusive right to use the name, "Kwik Photo" in his booths and retail operations, reserved the right to approve the specific locations in Hinds and Rankin Counties, and, in fact, specified the Candlestick Park location in Hinds County, and the Bright Shopping Center in the town of Pearl, Rankin County. He further conceded that Thompson and Byrd reserved the right to set plaintiff's retail prices and that he, plaintiff, agreed to purchase all materials, equipment and products sold or consumed in his Kwik Photo businesses from the franchisors and to have all his processing and developing of films handled by the franchisors through their processor, designated at the beginning of the contract as Kolor Print, Inc. Plaintiff further agreed in the agreement that, at such time as he became disassociated from "Kwik Photo" business, he would not engage in the same or a similar type business for a period of five years from the date of disassociation.

The pertinent parts of the agreement, styled "Franchise Agreement for Operation of 'Kwik-Photo' Businesses," relied on by plaintiff, read as follows:

"5. Franchisee further agrees to sell all items and services handled in the 'Kwik Photo' retail business operations described above and at the prices as stated and shown in 'Exhibit A' attached hereto and by reference made a part hereof with the Franchisor, reserving the right at all times to modify or change the prices as shown by said 'Exhibit A' attached hereto.

6. Franchisee further agrees to purchase exclusively from Franchisor all of the materials, equipment and products sold or used or consumed in the operation of said 'Kwik Photo' businesses and to have all processing and developing of films handled by Franchisee done through and by Franchisor herein; and to purchase exclusively from Franchisor herein all supplies, equipment, and materials consumed and used by Franchisee for the operation of the various retail 'Kwik Photo' outlets hereunder; and, Franchisee agrees to make payment in full for all items sold by and purchased from Franchisor and services so rendered by Franchisor within ten (10) days after receipt of invoice covering said items so purchased.

12. The Franchisee further agrees that in the event of cancellation of this agreement as herein provided or upon Franchisee's becoming disassociated with the 'Kwik Photo' system and operation for any reason whatsoever that Franchisee will not and is prohibited to engage in the same or similar type business, whether directly or indirectly, as an employee, partner, stockholder or owner at any place at any time under any conditions for a period of 5 years from the date of such cancellation or disassociation."

As a part of their assistance to plaintiff, Thompson and Byrd purchased two booths, identified by a distinctive color and "Kwik Photo" signs, and moved them to plaintiff's locations. These booths were purchased in Little Rock, Arkansas, the same city in which Kolor Print is located. Thompson and Byrd also instructed plaintiff in learning the business, particularly in the art of daily identifying, bagging and mailing the rolls of exposed film to the processor, and keeping the necessary records on the processed film and new film.

Plaintiff began his Hinds County operation on August 4, 1969 and his Rankin County operation the following day. He sent his film daily to Kolor Print for processing, with a record of same to franchisors, and testified that for the first month the processed films were returned within the three days' time promised by Thompson and Byrd. He was billed, not by Kolor Print, but by the franchisors who added a mark-up of 20¢ per roll. He purchased his new film from the franchisors who also added 10¢ per roll to the cost. At the end of his first month's operations, plaintiff testified that he began having delays in the return of the processed film from Kolor Print, some of the film even being lost, and that his customers became irate. When he called Kolor Print in Arkansas his calls were referred to the franchisors in Meridian. According to plaintiff the quality of film purchased from the franchisors also began to deteriorate. After

plaintiff was approached by a salesman from a New Orleans, Louisiana processor, who offered plaintiff better service than he was getting from Kolor Print, permission to deal with the New Orleans processor was denied by Thompson and Byrd. Because the quality of unprocessed film from these franchisors was so poor, and more particularly because of the delay in the return of developed film, plaintiff testified that he lost his repeat customers and was compelled to close his operation in Rankin County in October 1969, only two months after it was begun. He continued the Hinds County operation until March 1970. He received permission from the franchisor to move his Rankin County booth to Vicksburg. Although he conceded that the franchisors moved his booth at no cost to him, he had to make a utility deposit in Vicksburg and pay $100.00 per month rent. This operation began in December 1969. By this time, plaintiff claimed he was compelled to seek other employment for himself, and hire female employees to run his Kwik Photo operations at an hourly wage. In January 1970, plaintiff stated that he was finally able to persuade the franchisors to permit him to send his film to an Alabama processor, Alabama Photo Service, no longer a defendant herein, to whom the franchisors also turned for the processing of their film from their retail Kwik Photo outlets. Plaintiff was also able to get the franchisors to sell him Kodak film, but at a higher price than plaintiff could have bought as a wholesale buyer, which the franchisors did not permit him to do. Nor was he permitted to sell unrelated products, such as music tapes, as he at one time wanted to do.

Plaintiff testified that after moving his Rankin County location to Vicksburg, and, in spite of the unanticipated costs, the Vicksburg location was initially profitable. However, when he returned from a military encampment in the summer of 1970, he found his processed film held up by Alabama Photo Service because the franchisors had

failed to pay plaintiff's bill with Alabama Photo Service. In order to get his film released, he was obliged, in August 1970, to execute a promissory note to Instant Photo, Inc.,[1] for $2,995.97, secured by a mortgage on his Kwik Photo booths and inventory. After making two monthly payments of $100.00 each, plaintiff made no further payments. On November 11, 1970, Kwik Photo, Inc. notified plaintiff his franchise agreement was canceled for flagrant disregard of its terms. He had previously closed his operation in Hinds County in March 1970, and lost that booth when his landlord claimed a lien on it for nonpayment of rent. He claimed that this loss was attributable to the franchisors who delayed on their promise to move this booth to Natchez, Mississippi, until it was seized by the landlord.

From August 1969 to November 1970, when plaintiff's franchise was cancelled, he claimed he lost a total of $55,000.00. The only itemization he offered of these losses was the sum of $14,000.00 borrowed by his father on plaintiff's behalf, $12,000.00 of which was paid to Thompson and Byrd under the franchise agreement, the remaining $2,000.00 being used for operating capital. Of the balance of his loss, he said he was compelled to seek permanent employment for himself, paying approximately $300.00 per month of his salary from other employment into his film operations and borrowing the rest. He offered into evidence copies of his 1969 and 1970 income tax returns, showing gross receipts from his Kwik Photo business of $2,167.57 in 1969 and $6,454.68 in 1970, with a net loss in 1969 of $5,729.07, and in 1970 of $18,876.39. In his 1969 return, plaintiff showed that he paid $2,196.62 for merchandise, $1,431.40 for processing, and $1,619.00 for labor, not including a salary for himself. His 1970 return reflects that his purchases were $255.54, processing $8,397.74 and $3,318.60 for labor, not including himself. Plaintiff also claimed as damages an anticipated profit equal to $1,500.00 per month.

Plaintiff, in a lengthy amended complaint, charged all of the original defendants with a conspiracy to bilk him of $12,000.00, the asserted franchise fee, at a time when Thompson and Byrd had nothing to franchise except services and products available to plaintiff from other sources without the anticompetitive restrictions and limitations imposed by the franchise agreement. And further, that this operation was conducted through a sham corporation for the purpose of insulating the individual defendants from liability for their anti-trust violations.

In plaintiff's post-trial brief, he has limited his claims to alleged violations of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, all arising out of the franchise agreement, as follows:

*Per se violations*

(a) The establishment of fixed territories under a franchise which offered no corresponding trademark, good will, business interest or other franchise to protect, and which restricted plaintiff to a poor market area.

(b) Total restriction as to plaintiff's source of supply.

(c) Price fixing or control of plaintiffs' retail sales prices.

(d) Restraint forbidding plaintiff from handling products other than furnished by the franchisors.

*Rule of reason violations*

(a) Restrictive covenant for plaintiff not to compete with franchisors for five years after the termination of his franchise.

(b) Full line forcing when defendants had no services or products which were unique.

---

[1]. Instant Photo, Inc. as noted above, was changed to Kwik Photo, Inc. in September 1970.

James F. Thompson, Jr., called as an adverse witness by plaintiff, and Charles Norman Byrd testified on behalf of themselves and Kwik Photo, Inc. Thompson and Byrd got into the quick processing of film in the Meridian area in April 1969. It was a new business in that area and initially profitable. They intended to develop a franchise arrangement. Both said that plaintiff hung around their Meridian outlet, learning their method of operation, and asking to participate. They finally decided to offer him their first franchise. They knew plaintiff was only 20 years old, but said that plaintiff discussed the proposition with his father, as plaintiff admitted, and was anxious to start his own enterprise. They denied that they told plaintiff the name Kwik Photo was a registered trademark, and admitted, that as a new name, it had little value outside the Meridian area. In return for the $12,000.00 consideration for the franchised locations, these defendants stated that they furnished plaintiff two portable booths, with readily identifiable "Kwik Photo" signs painted thereon, which were purchased in Arkansas for $900.00 each. Each booth was fully equipped with a display case, a cash register, air conditioning, signs, and an inventory of film and cameras of a value of $900.00. They furnished and trained plaintiff in an accounting system for in-going and out-going film, including inventory controls, that had been successful for them. They attributed their success to fast, economical film processing by their processor, Kolor Print, Inc., of Arkansas. Their relationship with plaintiff was that plaintiff, using the system they taught him, would mail his film directly to the processor with plaintiff's costs being billed to Kwik Photo, which in turn billed plaintiff with a 15 percent mark-up in return for Kwik Photo's credit. The combined volume of plaintiff's operations with that of defendants resulted in lower prices charged by Kolor Print. While conceding that they, in the contract, reserved the right to fix plaintiff's retail prices

and that they furnished a retail price list to plaintiff based on their own retail prices, they denied that plaintiff was held to these prices, saying that he was allowed to change prices and did so with the defendants furnishing plaintiff signs reflecting his price changes. They were interested in his success, saying they offered to help him in anyway, including giving him an $800.00 credit for advertising. They admitted not letting plaintiff deal with a New Orleans processor, for the reason that this processor was more expensive than defendants' processor. This statement was not refuted by plaintiff. They admitted that plaintiff agreed in his contract to buy film and related products through Kwik Photo. They attributed plaintiff's business failure to the lack of his own personal supervision over his outlets, hiring outside help who improperly identified film going to the processor or failed to identify plaintiff's film. They stated that plaintiff remained in arrears on his processing account, and got so behind in payments due Alabama Photo that Alabama Photo not only held up plaintiff's film but defendants' as well. They admitted to the extent that film was bought from and processed by out of state processors that their operations as well as plaintiff's was in interstate commerce, but they denied that the volume of plaintiff's interstate trade had an appreciable effect on interstate commerce. These defendants further testified that plaintiff's franchise was the only one issued by them and that they thereafter continued through their own outlets only, which at the time of trial had become unprofitable.

In a pre-trial motion by Kwik Photo, Inc. to dismiss and on a motion by Thompson and Byrd for summary judgment, these defendants argued that plaintiff had failed to establish the jurisdiction of this Court for anti-trust violations in failing to allege that there was a substantial volume of interstate commerce involved, and that there were no allegations that competition was lessened in the area of plaintiff's business

or that the public had been damaged in any way.

At the conclusion of plaintiff's evidence, again at the conclusion of their evidence, and in post trial briefs, defendants Thompson, Byrd and Kwik Photo, Inc., urged the dismissal of plaintiff's action on grounds similar to those urged in their pre-trial motions, and primarily for the reason plaintiff failed to show any violations substantially affecting the flow of interstate commerce, the total of plaintiff's processing costs being no more than $7,000.00 during the entire time he was in business, certainly de minimus in relation to the total volume of film processing carried on by competitors in any of plaintiff's locations during a similar period of time. Further, that plaintiff's acquiescence in the franchise agreement involved no anti-trust violations or predatory actions by defendants; and, finally, plaintiff's action is nothing more than an alleged breach of contract, for which this Court lacks diversity jurisdiction.

■ Of the alleged violations, specified above, plaintiff has taken the position that per se violations, such as price-fixing, do not require proof of the amount of interstate commerce affected. See *Citizen Publishing Co. v. U. S.*, 394 U.S. 131, 135, 89 S.Ct. 927, 22 L.Ed.2d 148. This is ordinarily true because price-fixing is in itself an unreasonable restraint on trade no matter how great or small. See 54 Am.Jur.2d, "Monopolies, etc.", #45, page 693. The Court finds that plaintiff and the franchisors did agree in the franchise agreement that plaintiff would sell all items and services handled in plaintiff's Kwik Photo retail business operations at prices fixed by the franchisors. The proof, however, reflected that plaintiff changed his prices from time to time with the defendants' consent. In the testimony of Thompson and Byrd mentioned above, they assisted plaintiff in these price changes and even furnished signs showing the changes for plaintiff to display. Although not necessarily decisive of the issue, in a photograph in evidence showing price signs on one of plaintiff's booths, the figures thereon do not correspond to a price list put in evidence by plaintiff.

■ Of foremost concern to the Court, however is the lack of any evidence reflecting the amount of that part of plaintiff's business or defendants, that is, the film processing by out of state processors of undeveloped film, in comparison to the total flow in interstate commerce. The defendants claim that the total cost of plaintiff's out of state processing, by dollar volume, was only $7,000.00, being a totally insufficient amount to constitute a restraint on interstate commerce. Plaintiff's income tax returns reflect that he had processing costs in 1969 of $1,431.40 and in 1970 the sum of $8,397.74. As he had closed one operation in 1969, and the other in March 1970, the Court is loathe to accept the latter amount of $8,397.74 as attributable in its entirety to his one remaining Kwik Photo operation. But, even if his processing by dollar volume was nearer $10,000 than the figure claimed by the defendants, very little of which he paid by his own admissions, the Court finds the record totally lacking in any comparison figure, that is the total dollar volume of out of state processing of plaintiff's or defendants' competitors in their market areas. It is obvious that plaintiff and defendants were trying to enter a competitive field, new to them. In the absence of such evidence, the Court is constrained to find that plaintiff's evidence does not meet the minimum requirements for anti-trust litigation.

Similarly the charge that defendants were guilty of tying in merchandise other than film processing is not supported by any evidence that the tying product was other than minimal, much less affording defendants' "appreciable" economic power over the tying product. See *Fortner Enterprises, Inc. v. U. S.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495. Having failed to establish jurisdic-

tion by failing to show that his interstate trade was more than de minimus, plaintiff's proof necessarily fails to show that he was damaged by any antitrust violation on the part of Thompson and Byrd, or Kwik Photo, Inc., as required by 15 U.S.C. § 15, in order to recover treble damages. If wrong in this assertion, the Court nevertheless finds that plaintiff has failed in his burden to show that his claimed losses, or any part of them, are causally related to the claimed anti-trust violations.

The Court might feel constrained to find, on the facts in this case, that defendants may have been guilty of bad faith or over-reaching in their contract with plaintiff, but neither of these grounds establishes anti-trust jurisdiction.

The Court, accordingly, finds that plaintiff's suit must be dismissed.

An order to this effect, with court costs taxed to plaintiff, may be submitted.