**COMMITTEE FOR AN INDEPENDENT P–I, a corporation, et al., Plaintiffs,**

v.

**William French SMITH, Attorney General of the United States, et al., Defendants.**

**No. C82–730R.**

United States District Court, W.D. Washington.

Aug. 27, 1982.

William L. Dwyer, Culp, Dwyer, Gutterson & Grader, Seattle, Wash., for plaintiffs.

Payton Smith, Shelly C. Shapiro, P. Cameron DeVore, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., Jonathan E. Thackeray, John M. Gherlein, Cleveland, Ohio, David J. Anderson, Andrew M. Wolfe, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

### MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ROTHSTEIN, District Judge.

THIS MATTER comes before the court upon cross motions for summary judgment by the four parties. Having reviewed the motions, memoranda of counsel, and the entire record, the court finds and rules as follows:

### I. BACKGROUND

The Seattle Times Company ("Times") and the Seattle Post-Intelligencer ("P–I") have been for many years the only two metropolitan daily newspapers in Seattle. On March 27, 1981 the Times and the Hearst Corporation ("Hearst"), as publisher of the P–I, filed an application with the Attorney General of the United States, William French Smith, for approval of a joint operating arrangement ("JOA"), pursuant to the Newspaper Preservation Act, 15 U.S.C. § 1801 et seq. The Act authorizes a limited exemption from the antitrust laws for a JOA if the parties obtain the prior written consent of the Attorney General. In order to grant approval of a JOA, the Attorney General must find that one of the newspapers involved is a "failing newspaper," defined in the statute as "a newspaper publication which, regardless of its ownership or affiliations, is in probable danger of financial failure." 15 U.S.C. § 1803(b), 1802(5).[1] The Attorney General must also find that approval of the arrangement would effectuate the policy and purpose of the Act. 15 U.S.C. § 1803(b).

The congressional policy underlying the Act is to maintain a newspaper press editorially and reportorially independent and competitive. 15 U.S.C. § 1801. The term "joint operating arrangement" is broadly defined. It includes almost any form of arrangement or joint venture between two or more independently-owned newspapers "pursuant to which joint or common production facilities are established or operated," provided that "there is no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined." 15 U.S.C. § 1802(2). A JOA allows the elimination, therefore, of commercial competition between the newspapers.

The procedures by which application may be made to the Attorney General for his approval of a JOA are set forth in regulations of the Department of Justice at 28 C.F.R. § 48. The Assistant Attorney General in charge of the Antitrust Division initially submits a report to the Attorney General recommending either that the proposed JOA be approved or disapproved or that a hearing be held to resolve material issues of fact. 28 C.F.R. § 48.7. When a hearing is held, the Antitrust Division be-

---

1. Section 1803(b) provides:

It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall de-termine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.

comes a party. *Id.* at § 48.10(b). Here, the Assistant Attorney General for the Antitrust Division recommended that the Attorney General direct a hearing to resolve various issues of fact. After receiving replies and supplemental materials from applicants and comments by those opposed to the JOA, the Attorney General ordered a hearing on the application and directed that it be held in Seattle, Washington.

On September 29, 1981, Daniel H. Hanscom was appointed administrative law judge (ALJ) to conduct the hearing. Under the Attorney General's order the hearing record had to be closed within 60 days after appointment and a recommended decision rendered within 20 days thereafter. On September 30, 1981, the Attorney General directed the ALJ to permit the participation of intervenors opposed to the application. The intervenors, who are the plaintiffs in this action, are various groups made up of employees of the P–I, advertisers, subscribers and publishers of other newspapers in the neighborhoods or suburbs of Seattle, and local journalists and consumers. The intervenor-plaintiffs have been jointly represented by single counsel.

The hearing began in Seattle on November 2, 1981, and continued for three and one-half weeks. A voluminous record of testimonial and documentary evidence was developed at the hearing, which concluded with oral argument and the submission by the parties of proposed findings and memoranda of law to the ALJ. Both the intervenors and the Antitrust Division opposed approval of the application. On January 14, 1982, the ALJ issued his Recommended Decision, including 162 Findings of Fact and a Memorandum Opinion which recommended that the proposed JOA be approved. The Antitrust Division strongly recommended against approval stating that the "legal errors we perceive here are not only of significance to the Seattle application, but also set an erroneous precedent for future proceedings under the Act." The Attorney General adopted the findings and conclusions of the ALJ with the exception of the portion of Finding of Fact 158 which stated that the P–I could be sold "to a person or

firm who could, and would, continue it in operation as an independent metropolitan daily."

The Attorney General's order was filed on June 15, 1982 and would have allowed the JOA to go into effect on June 25, 1982, but on June 24, 1982 this court issued its order postponing the effective date of the Attorney General's order until August 27, 1982.

The plaintiffs raise various issues:

1) There is no support for the Attorney General's refusal to adopt the ALJ's finding that the P–I could be sold at fair market value to a person who would continue that newspaper in operation as an independent metropolitan daily, and, given that finding by the ALJ, the application should have been denied;

2) On the record before the ALJ regarding the financial condition of the P–I, the P–I cannot be "in probable danger of financial failure;"

3) The Attorney General improperly determined that approval of this application would effectuate the policy and purpose of the Act because this JOA is unnecessarily anticompetitive and would injure and impair the editorial voices of smaller newspapers in the market;

4) The Newspaper Preservation Act is unconstitutional in that it violates First Amendment rights to free speech and free press.

## II. STANDARD OF REVIEW

### A. Factual Determinations

The Newspaper Preservation Act contains no specific statutory provision for review of the Attorney General's order granting or denying applications for a JOA. The parties agree that the Administrative Procedure Act governs and that this court has jurisdiction to review the order pursuant to 5 U.S.C. § 701 *et seq.* The parties do dispute the scope of the court's review. 5 U.S.C. § 706 provides:

> to the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, inter-

pret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or . . . .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

Plaintiffs claim the § 706(2)(E) applies here because there was an agency hearing pursuant to the regulations, 28 C.F.R. §§ 48.7, 48.10. Defendants argue that § 706(2)(E), by its own terms, applies only to cases where the hearing is "provided by statute." *Automobile Club of New York, Inc. v. Cox,* 592 F.2d 658, 664 (2d Cir.1979). The court's disposition of this action makes it unnecessary to decide whether hearings provided for by regulation suffice to bring review within the "substantial evidence" provision. The issues which require the court to consider factual aspects of the record must be decided against plaintiffs even if the "substantial evidence" standard is followed.

### B. Legal Determinations

#### 1. *Deference to the Attorney General's Interpretation of the Act*

[1–3] The United States Supreme Court has repeated many times that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. *E.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969). In *Red Lion* the Court wrote that this was especially true when Congress has refused to alter the adminis-

trative construction. In that particular case, Congress had even ratified the administrative position by positive legislation. However, a reviewing court must never shy from its duty to carefully examine the agency's interpretation of the law; to do otherwise is to deny meaningful review. An order may not stand if the agency has misconceived the law. *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 171–72, 92 S.Ct. 383, 393–94, 30 L.Ed.2d 341 (1971); *Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970); *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); *Midwest Video Corp. v. FCC,* 571 F.2d 1025, 1037 (8th Cir.1978), aff'd, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979).

Courts "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968), *quoting, NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).

Even under the "arbitrary and capricious" standard urged by the Attorney General and the JOA applicants, the court finds that the Attorney General has erred as a matter of law.

#### 2. *Narrow Construction of Antitrust Exemptions*

Statutory exemptions to the antitrust laws, as plaintiffs point out, are to be narrowly construed. *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). This rule in no way conflicts with the standard of this court's review nor with the proposition that the court's paramount concern is to construe the exemption in light of its statutory mandate and its legislative history. *Id.* at 211, 99 S.Ct. at 1073.

### III. THE PROSPECTIVE BUYER ISSUE

According to the plaintiffs, the Attorney General's order "rests upon the erroneous

assumption of law that a newspaper proprietor can deliberately block ... a sale to a new owner willing and able to carry on independent publication," and still obtain an antitrust exemption under the Newspaper Preservation Act. In his findings of fact, the ALJ found that the position of the Hearst Corporation has consistently been that the P–I is not for sale. ALJ's Recommended Decision ("ALJ's Decision"), p. 83, Finding of Fact ("FF") 153. He also found that, although the P–I is not for sale, there have been serious inquiries from time to time from apparently responsible, potential buyers and he listed details of the inquiries. ALJ's Decision, p. 83, FF 157. The ALJ's crucial finding was FF 158:

> Considering that the Post-Intelligencer is not, and has not been for sale, and that all inquiries regarding possible purchase have been rebuffed by The Hearst Corporation with statements to that effect, and that responsible prospective purchasers nevertheless continue to appear and express an interest in buying the Post-Intelligencer, it must be concluded that the Post-Intelligencer could in all probability be sold at fair market value to a person or firm who could, and would, continue it in operation as an independent metropolitan daily.

*Id.*

The ALJ found as a matter of law:

> The Hearst Corporation is not required to offer the Post-Intelligencer for sale, or to demonstrate that it cannot be sold to a buyer willing and able to continue it in operation as an independent editorial voice, as a condition for approval of the joint operating arrangement with the Seattle Times.

*Id.* at 88–89.

Elsewhere, the ALJ recognized that Hearst had the burden of proving that the P–I is in "probable danger of financial failure" and is a "failing newspaper." He found that Hearst had sustained this bur-

den. ALJ's Decision at 88. But, according to the ALJ, that burden does not carry a requirement that a

> failing newspaper demonstrate that there are no buyers and no alternatives as a condition for entering into a joint operating arrangement. The Hearst Corporation, in short, does not have to put the Post-Intelligencer up for sale before it can qualify as a "failing newspaper" under the Newspaper Preservation Act.

*Id.* at 90.

The Assistant Attorney General for the Antitrust Division filed exceptions to the recommended decision of the ALJ ("AAG's Exceptions"). According to the Antitrust Division, the ALJ's conclusion that the proposed JOA should be approved was "plain error of law" in light of the ALJ's FF 158 that the P–I could be sold at fair market value to a buyer who would continue it in operation. AAG's Exceptions at 12.

> Where such purchasers are available, the allegedly failing newspaper cannot be deemed "in probable danger of financial failure," and elimination of commercial competition is not justified.

*Id.* at 17. The Division noted that the Times–P–I application was the first for which the Assistant Attorney General recommended denial. *Id.* at 3. It is the Antitrust Division's opinion that the ALJ's interpretation of the Act is inconsistent with congressional intent and rational economic analysis.[2] *Id.* at 5.

The Attorney General did not follow the Antitrust Division's recommendation, but instead approved the application for the JOA. He adopted the findings and conclusions of the ALJ with the exception of the portion of FF 158 which provides that the "P–I could be sold 'to a person or firm who could, and would, continue it in operation as an independent metropolitan daily.'" Opinion and Order of the Attorney General ("A.G.'s Order"), p. 5. The Attorney Gener-

---

**2.** The Antitrust Division's opinion was based on what it saw as two legal errors of the ALJ. One was the ALJ's treatment of the buyer issue. The other issue was the ALJ's exclusion, as a matter of law, of evidence on an incremen-

tal analysis of the P–I's financial condition. Plaintiffs have not raised the latter issue here, but maintain that even without such analysis, the P–I failed to prove it was in probable danger of financial failure.

al gave as his reason that he could find no evidentiary support for such a finding in the record. *Id.* He gave no elaboration on the evidence, or lack thereof, regarding the buyer issue. The court finds that the Attorney General's rejection of FF 158 was arbitrary and capricious.

In support of the Attorney General's rejection of FF 158, the defendants offer the facts that no prospective buyer testified at the administrative hearing, FF 158 does not define fair market value, and the record is silent about whether a buyer could bring the P–I to profitability. The obvious response is that the record is barren or insufficient on those questions because the P–I has consistently rebuffed all would-be purchasers, and the ALJ did not solicit such testimony because of his legal conclusion that it was irrelevant. There is extensive evidence in the record regarding inquiries by prospective purchasers, and Hearst discusses it arguing that evidence of inquiries is not evidence that the P–I could be sold.

The crux of the problem is whether a correct definition of a "failing newspaper" must include a consideration of the existence of willing buyers. The answer lies in the legislative history of the Newspaper Preservation Act. The term "failing newspaper" is defined in the Act as "a newspaper publication which, regardless of its ownership or affiliations, is in probable danger of financial failure." 15 U.S.C. § 1802(5).[3] The "failing newspaper" test was an express repudiation of the "failing company" defense used in antitrust law and applied by the Supreme Court in *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).

*Citizen* involved a challenge by the Justice Department to a JOA entered into by two Tucson, Arizona newspapers. The Court held that in order to qualify as a "failing company," a newspaper would have to have been on the brink of liquidation, would have to show that there were no

alternatives to a JOA, and would have to establish that there were no prospective noncompeting buyers. 394 U.S. at 137–38, 89 S.Ct. at 930–31. While the case was pending before the Supreme Court, bills had been introduced in both houses of the 90th Congress to immunize the two Tucson papers as well as the 21 other JOAs already in existence. *See, e.g.,* S. 1312, 90th Cong., 1st Sess. (1967); H.R. 19123, 90th Cong., 2d Sess. (1968). When the Supreme Court's opinion was issued, bills were reintroduced. The exemption extended in the bills was more limited than in the earlier bills. *See* S. 1520, 91st Cong., 1st Sess. § 4(b) (1969); H.R. 270, 91st Cong., 1st Sess. § 4(b) (1969). See statements of Representatives McCulloch, Railsback, and Edwards during House debate. 116 Cong.Rec. 23148, 23154, 23167 (1970).

The bill finally enacted was intended by Congress to permit newspapers to enter into a JOA before their financial conditions deteriorated to the point where the "failing company" defense would be of no use:

> The most important assets of a newspaper are its personnel and reputation, and these may be lost as financial failure approaches. Generally by the time the newspaper is sufficiently beyond hope to satisfy the 'failing company' test of the courts, it may well be of little value as an acquisition. Yet under present law the courts have to apply the extremely narrow 'failing company' doctrine as it has developed in those industries lacking the unique characteristics of the newspaper business.

Statement of Congressman Annunzio. 116 Cong.Rec. 23168 (1970). Relying on similar statements and the clear intent of Congress to relax the test set forth in *Citizen,* the ALJ concluded that there was no requirement that a failing newspaper demonstrate that there are no buyers and no alternatives as a condition for entering into a JOA. ALJ's Decision at 90. The ALJ also rejected the plaintiffs' view that the "failing

---

**3.** The test applicable to prospective arrangements is more stringent than the one for JOAs already in effect when the Act was passed. For existing arrangements, it was necessary

that, at the time the arrangement was entered into, not more than one of the newspapers "was likely to remain or become a financially sound publication." 15 U.S.C. § 1803(a).

newspaper" test is derived from the standard for judging bank mergers under the Bank Merger Act, 12 U.S.C. § 1828(c).

The Senate Report states that the phrase "in danger of probable failure" [sic] is taken from the Bank Merger Act:

> This proposed legislation, as amended, creates a realistic definition of a failing newspaper by establishing a less stringent test than that applied in *Citizen Publishing Co. v. United States,* 394 U.S. 131[, 89 S.Ct. 927, 22 L.Ed.2d 148]. The failing company doctrine is court created. It has been recognized by the Congress in the Cellar-Kefauver Act, and Congress has in the past demonstrated its ability to reshape this doctrine to fit specific situations. Such was done in the Bank Merger Act of 1966, where the Congress devised a less stringent failing test for banks, subsequently accepted by the Supreme Court in the Third National Bank of Nashville decision.

S.Rep. No. 535, 91st Cong., 1st Sess. 6 (1969). Despite the fact that the House Report contains no reference to the Bank Merger Act, as noted by the ALJ, the legislative history indicates that the House also intended the "failing newspaper" test to be similar to the test applied to bank mergers. During House debate, there was objection that the term "probable danger of financial failure" was loosely drawn. Congressman Kastenmeier, the floor leader for the bill,[4] stated:

> The term "in probable danger of financial failure" is one that has a legislative history. It comes out of the Bank Merger Act. It is understood by the courts in the field, and happens to be a term that is well known.

116 Cong.Rec. 23146 (1970).

In a cogent analysis of the legislative history bearing on the issue under consideration, Administrative Law Judge Donald R. Moore concluded that Congress intended the "failing newspaper" test to be interpreted with reference to the substantive standards established by the Supreme Court in *United States v. Third National Bank,* 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968)[5]. As ALJ Moore observed, "probable failure" is not the statutory test for determining the legality of bank mergers. However, certain notices and waiting period provisions may be dispensed with if the agency finds that it must act immediately to prevent the "probable failure" of one of the banks involved. 12 U.S.C. § 1828(c)(3), (4), (6). In *Third National Bank* the Supreme Court defined the purpose of the Bank Merger Act in language analogous to the congressional declaration of policy in the Newspaper Preservation Act, 15 U.S.C. § 1801.

The Court lay down factors to be weighed to determine whether the risk of a bank's failure was great enough to justify an anticompetitive merger: "the feasibility of curative measures short of merger," whether "healthy aspects of the bank's condition . . . removed any danger of failure in the foreseeable future," and whether "the injury to the public interest flowing from the loss of competition could be avoided and the convenience and needs of the community benefited in ways short of merger but within the competence of reasonably able businessmen." 390 U.S. at 187–89, 88 S.Ct. at 892–93. The applicants for the merger must "reliably establish the unavailability of alternative solutions." *Id.* at 190, 88 S.Ct. at 893. The Court held that the District Court erred when it failed to consider the possibility of the infusion of new management or the possibility of a sale to a party other than the bank's major competitor.

---

**4.** The Supreme Court has often emphasized the statements of the floor manager of a bill to support its interpretation of an ambiguous provision. *See, e.g., Guessefeldt v. McGrath,* 342 U.S. 308, 311, 72 S.Ct. 338, 340, 96 L.Ed. 342 (1952); *Bindczyck v. Finucane,* 342 U.S. 76, 83, 72 S.Ct. 130, 134, 96 L.Ed. 100 (1952); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 125, 62 S.Ct. 523, 529, 86 L.Ed. 726 (1942).

**5.** *See* In the Matter of Application by The Cincinnati Inquirer, Inc., and the E.W. Scripps Company for Approval of a Joint Operating Arrangement Pursuant to the Newspaper Preservation Act, 15 U.S.C. § 1801, *et seq.,* Recommended Decision, pp. 118–128.

If ... another competent businessman with a willingness to tackle the management problems of the bank had offered to buy out the Weaver interests at an acceptable price, it seems obvious that the Weaver group ... should not be permitted to merge and to ignore an available alternative.

*Id.* at 189, 88 S.Ct. at 893. Statements made by both Senators and Representatives during congressional debate reinforce the conclusion that, under the Newspaper Preservation Act, a JOA should be approved only if there are no alternatives that would permit continued publication of the allegedly failing newspaper. Senate Debate, 116 Cong.Rec. 1786, 1795, 2004, 2006 (1970); House Debate, 116 Cong.Rec. 23148, 23154 (1970).

Judge Moore concluded that Congress did not intend to require a search for or consideration of noncompeting purchasers as an absolute prerequisite to the approval of a JOA. However, "[i]f an alternative solution might be the sale of the newspaper to someone else, that alternative must have been explored before approval may properly be granted." ALJ Moore's Recommended Decision at 126–27. Except for that portion dealing with the issue of incremental analysis, Administrative Law Judge Moore's Recommended Decision was adopted by Attorney General Benjamin Civiletti in his Order of November 26, 1979. The fact that the Attorney General's position on the "failing newspaper" test and the buyer issue has changed with Attorney General Smith's Order in this case has direct bearing on the question of the scope of this court's review. The "agency's" interpretation of the law on this question is of very short duration, is inconsistent with prior agency interpretation, and has never been expressly or implicitly reviewed by either the courts or Congress. See the discussion regarding *Red Lion Broadcasting, supra* at p. 989 of this order. Judge Moore recommended approval of the Cincinnati JOA because the evidence did not support a conclusion that there was another party ready, willing, and able to purchase the Post and to improve its operating results so as to permit its preser-

vation as an independent daily. *Id.* at 128. That conclusion is the opposite of FF 158 made by ALJ Hanscom. The court agrees with ALJ Moore's analysis. Based on the hearing record in this case and the ALJ's FF 158, approval of the Times–P–I JOA cannot be granted without exploring the alternative of sale to a noncompetitor.

■ The Attorney General's approval not only rejected FF 158, but also stressed that the P–I was a "failing newspaper" in light of the ALJ's FF 109 at 59:

[T]he evidence does not establish that new management would be any more successful than Hearst and current management of the Post-Intelligencer in returning it to profitability.

Where the record establishes that there are competent businessmen ready and willing to tackle the management problems of the P–I, the burden of proof rests upon the applicants for the JOA to demonstrate that the new owners could not make the P–I succeed. 28 C.F.R. § 48.10(a)(4). There has been no fair opportunity for prospective buyers to prepare and present their plans to make the P–I profitable. The court wishes to make clear that it does not disagree with the ALJ that Hearst is not obligated to seek out buyers. Nevertheless, where there are ready and willing buyers who present themselves, if Hearst wishes to obtain the benefits of the JOA, it must carry the burden of demonstrating that none of those buyers could continue to operate the P–I as an independent daily.

■ In short, in order for the P–I to qualify as a "failing newspaper" for purposes of a JOA, defendants must show that no other viable alternatives exist for maintaining the newspaper's independent editorial voice. This result is consonant with both the policy and purpose of the Newspaper Preservation Act and with the narrow construction to be accorded antitrust exemptions. Construing the Act to require that defendants demonstrate (and the ALJ or Attorney General consider) alternatives without anticompetitive impact is a reasonable and just fulfillment of the important

public purposes of preserving both independent editorial voices and competition.

## IV. THE "PROBABLE DANGER OF FINANCIAL FAILURE" ISSUE

Plaintiffs assert that the ALJ and Attorney General also applied the incorrect legal standard to the definition of "in probable danger of financial failure." Plaintiffs insist that, even without the JOA, Hearst has no intention of closing the P–I, and point out that §§ 1802(5), 1803(b), require the likelihood of actual closure.

It appears to the court that the ALJ did actually consider and apply "the likelihood of actual closure" factor in applying the "probable danger of financial failure" test. The ALJ found that without Hearst's backing the P–I "probably could not have continued to exist." ALJ's Decision at 88. The issue before the court, therefore, is not the correctness of the legal standard, but whether the evidence in the record supports the ALJ's conclusion.

Plaintiffs point to evidence in the record that the owners did not intend to close the P–I, that the P–I's losses have been modest by industry standards, that circulation and advertising trends have been mixed, and that Hearst mismanaged the P–I. All of this evidence was presented to the ALJ who received it, weighed it and found that the P–I was in danger of failing and probably could not have continued to exist without Hearst backing. ALJ's Decision at 88. This court cannot reevaluate the ALJ's factual determinations and impose its own interpretation. Even if the court were to apply the substantial evidence test urged by plaintiffs, the Attorney General's adoption of the ALJ's findings and conclusions regarding the P–I's financial condition must stand.

## V. ISSUE OF INJURY TO SMALLER PAPERS AND JOA TERMS THAT ARE UNNECESSARILY ANTICOMPETITIVE

 Plaintiffs take issue with the Attorney General's conclusion that the JOA would effectuate the policy and purpose of the Act. They argue that this conclusion is incorrect where the implementation of the JOA would injure and impair the editorial voices of smaller newspapers in the market and where the terms of the JOA are unnecessarily anticompetitive. It is obviously true, as plaintiffs state, that the purpose of the Act is to preserve a diversity of editorial voices in the community. But plaintiffs cite no authority to support their claim that the Attorney General must find that competing newspapers will not be harmed by the JOA, or that its terms are the least restrictive possible.

The legislative history contradicts the plaintiffs' position. During the congressional debates, Senators and Representatives spoke about the possible injurious effects of a JOA on smaller newspapers. The opponents of the Act either urged that the bills be defeated or proposed amendments to cure that defect. None of these views prevailed. See 116 Cong.Rec. 1816, 1996 (1970) (amendment proposed by Senator McIntyre); 116 Cong.Rec. 23149–50 (1970) (Representative McGregor). Senator Hruska, the Senate floor manager of the bill, spoke at length about the purpose and policy behind the Act. It is clear that the concern was to save papers which would otherwise disappear. The Act was drawn so as to keep the antitrust exemption narrow. Before approving a JOA, there had to be a finding that the JOA was "essential and justified" and that the applicant had tested alternatives before turning to a JOA. 116 Cong.Rec. 2005 (1970); see also statements of Rep. Kastenmeir, 116 Cong.Rec. 23146–48 (1970). Once such a finding is made, nothing more is required; nothing in the statute or its history indicates otherwise. The court rejects plaintiffs' argument. Where a JOA is otherwise legal there is no requirement that the Attorney General must find that there will be no injury to other newspapers or that the terms of the JOA are the least restrictive.

## VI. THE FIRST AMENDMENT ISSUES

 Plaintiffs make two constitutional arguments. They claim that the statute is unconstitutional under the First Amendment as it is applied in the present case, i.e., where there are smaller newspapers com-

peting with the two applicants, as here, approval of the JOA is a license to engage in otherwise illegal activity that will impair the First Amendment rights to free speech and press of the smaller papers. Plaintiffs' second claim is that the statute is unconstitutional on its face because it is a vague and overbroad delegation of power in an area affecting First Amendment rights. The court rejects both arguments.

The Act as applied does not license or regulate the content of speech. Plaintiffs' assertion that this JOA will have an economic effect which, in turn, will adversely affect the editorial voices of smaller newspapers is speculative. In any case, there is nothing in the Act itself or its present application to support their contentions. Two other courts have considered these same arguments.

This argument, however, ignores the conceptual difference between newspaper competition in the "economic sense" and "editorial and news gathering competition." Complete freedom of the press does not necessarily depend upon a free competitive economic market. The NPA can only be said to offend the first amendment if it in some way restrains the freedom of the press in some direct fashion.

*City & County of Honolulu v. Hawaii Newspaper Agency, Inc.,* 7 Media L.Rep. (BNA) 2495, 2497 (D. Hawaii 1981).

The Act pertinent to this case does not confer any license to monopolize and indeed has a specific provision prohibiting "predatory practices" (§ 1803(c)). The case of *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), relied on heavily by the plaintiffs, is clearly inapplicable. In that case the Supreme Court ruled unconstitutional a state taxing statute that was clearly aimed at certain large metropolitan newspapers that had opposed the political machine then in control of that state. It was clear and obnoxious political reprisal against the press by a corrupt demagogue. There is simply no comparison between that factual situation and the one underlying the instant legislation.

Here the Act was designed to preserve independent editorial voices. Regardless of the economic or social wisdom of such a course, it does not violate the freedom of the press. Rather it is merely a selective repeal of the antitrust laws. It merely loses the same shady market forces which existed before the passage of the Sherman, Clayton and other antitrust laws.

*Bay Guardian Co. v. Chronicle Publishing Co.,* 344 F.Supp. 1155, 1158 (N.D.Cal.1972).

Both courts also addressed the overbreadth question and, again, rejected the argument.

Without commenting upon the wisdom of the Act, the Court does not read it to impose restraints upon the plaintiffs' ability to publish their newspaper. Indeed the Act specifically forbids newspapers operating under a joint operating agreement from; ". . . predatory pricing, any predatory practice, or any other conduct in the otherwise lawful operations of a joint newspaper operating arrangement which would be unlawful under any antitrust law if engaged in by a single entity." (§ 1803(c))

*Bay Guardian Co.,* 344 F.Supp. at 1159. *See City & County of Honolulu,* 7 Media L.Rep. at 2499. Plaintiffs attempt to distinguish the *Bay Guardian* and *Honolulu* cases on the ground that they dealt with "grandfathered" arrangements which pre-existed passage of the statute. The distinction is without merit.

Plaintiffs also contend that the Attorney General has an "untrammeled delegation of licensing power," because the Act's standards are unconstitutionally vague. If this argument were correct, this court would have been unable to reach the conclusion it arrived at on the buyer issue. The statutory words "probable danger of financial failure" and "effectuate the policy and purpose of the Act" are not as unclear and undefined as plaintiffs depict. They are clear and defined enough to establish a standard which the Attorney General must follow. The court rejects the plaintiffs' constitutional arguments.

## ORDER

The court having considered the record and the evidence contained therein and the briefs of all the parties, and having set forth its reasoning, including its findings and conclusions in the foregoing opinion, it is now, therefore, ORDERED that:

The order of the Attorney General approving the Joint Operating Agreement between the Times and P–I is contrary to law and therefore invalid. Plaintiff's motion for summary judgment must be, and hereby is, GRANTED.

The Clerk of the Court is directed to send uncertified copies of this Order to counsel of record.